Filed:  December 4, 1997

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 96-2412
(CA-95-3811-AW)

---

Vivian Rice, etc., et al,

                                Plaintiffs - Appellants,

      versus

The Paladin Enterprises, etc.,

                                Defendant - Appellee.

---

O R D E R

---

The Court amends its opinion filed November 10, 1997, as follows:

On page 28, first paragraph, line 29 -- the cross-reference is corrected to read "_infra_ at 39-44."

On page 29, first paragraph, line 14 -- the cross-reference is corrected to read "_infra_ at 37-38."

On page 30, first full paragraph, line 18 -- the opening quotation mark before the phrase "to be represehensible" is deleted.

                         For the Court - By Direction

                         /s/ Patricia S. Connor

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VIVIAN RICE, Guardian and next
friend of Tamielle Horn; MARILYN
FARMER, Co-personal representatives
of the estate of Mildred Horn;
TIFFANI M. HORN, Co-personal
representatives of the estate of
Mildred Horn; MICHAEL D.
SAUNDERS, Individually and next
friend of Colin D. Saunders, a
minor and personal representative of
the estate of Janice Y. Saunders;
COLIN D. SAUNDERS; JANICE Y.
SAUNDERS,
Plaintiffs-Appellants,

v.

THE PALADIN ENTERPRISES,
INCORPORATED, a/k/a The Paladin
Press,
Defendant-Appellee,

and

PETER C. LUND,
Defendant.

DAVID CRUMP, Professor of
Constitutional Law and Recipient of
"Friend of the First Amendment"
Award; NATIONAL VICTIM CENTER;
STEPHANIE ROPER FOUNDATION,
INCORPORATED; VICTIMS RIGHTS
POLITICAL ACTION COMMITTEE; THE

No. 96-2412

HORROR WRITERS ASSOCIATION; THE
THOMAS JEFFERSON CENTER FOR THE
PROTECTION OF FREE EXPRESSION;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION; AMERICAN CIVIL
LIBERTIES UNION OF THE NATIONAL
CAPITOL AREA; AMERICAN CIVIL
LIBERTIES UNION OF COLORADO; ABC,
INCORPORATED; AMERICA ONLINE,
INCORPORATED; ASSOCIATION OF
AMERICAN PUBLISHERS; THE
BALTIMORE SUN COMPANY; E.W.
SCRIPPS COMPANY; FREEDOM TO READ
FOUNDATION; MAGAZINE PUBLISHERS
OF AMERICA, INCORPORATED;
MCCLATCHY NEWSPAPERS,
INCORPORATED; MEDIA GENERAL, INC.;
MEDIA PROFESSIONAL INSURANCE;
NATIONAL ASSOCIATION OF
BROADCASTERS; NEWSPAPERS
ASSOCIATION OF AMERICA; THE NEW
YORK TIMES; THE REPORTERS
COMMITTEE FOR FREEDOM OF THE
PRESS; SOCIETY OF PROFESSIONAL
JOURNALISTS; THE WASHINGTON POST,
Amici Curiae.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Williams, Jr., District Judge.
(CA-95-3811-AW)

Argued: May 7, 1997

Decided: November 10, 1997

Before WILKINS, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Luttig wrote the opinion, in which Judges Wilkins and Williams joined.

_____

**COUNSEL**

**ARGUED:** Rodney Alan Smolla, Marshall-Wythe School of Law, COLLEGE OF WILLIAM & MARY, Williamsburg, Virginia, for Appellants. Thomas Buchan Kelley, FAEGRE & BENSON, L.L.P., Denver, Colorado, for Appellee. **ON BRIEF:** John Marshall, MOLDAWER & MARSHALL, Rockville, Maryland; Howard Siegel, Rockville, Maryland; Thomas L. Heeney, HEENEY, ARMSTRONG & HEENEY, Rockville, Maryland, for Appellants. Steven D. Zansberg, FAEGRE & BENSON, L.L.P., Denver, Colorado; Lee Levine, Seth D. Berlin, LEVINE, PIERSON, SULLIVAN & KOCH, L.L.P., Washington, D.C., for Appellee. David Crump, UNIVERSITY OF HOUSTON LAW CENTER, Houston, Texas, for Amicus Curiae Crump. Neal Goldfarb, D. Thomas Nelson, Russell Butler, Charles G. Brown, INGERSOLL & BLOCH, Washington, D.C., for Amici Curiae National Victim Center, et al. Douglas E. Winter, BRYAN CAVE, L.L.P., Washington, D.C., for Amicus Curiae Horror Writers Association. Robert M. O'Neil, J. Joshua Wheeler, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION, Charlottesville, Virginia; Dwight H. Sullivan, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland; Arthur Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C.; Mark Silverstein, AMERICAN CIVIL LIBERTIES UNION OF COLORADO, Denver, Colorado, for Amici Curiae Thomas Jefferson Center, et al. Bruce W. Sanford, Henry S. Hoberman, Michael J. Lorenger, BAKER & HOSTETLER, L.L.P., College Park, Maryland, for Amici Curiae ABC, et al.

_____

**OPINION**

LUTTIG, Circuit Judge:

To Those Who Think,
To Those Who Do,
To Those Who Succeed.

3

Success is nothing more than taking advantage
of an opportunity.

A WOMAN RECENTLY ASKED HOW I could, in good conscience,
write an instruction book on murder.

"How can you live with yourself if someone uses what you write to
go out and take a human life?" she whined.

I am afraid she was quite offended by my answer.

It is my opinion that the professional hit man fills a need in society
and is, at times, the only alternative for "personal" justice. Moreover,
if my advice and the proven methods in this book are followed, cer-
tainly no one will ever know.

[A]lmost every man harbors a fantasy of living the life of Mack
Bolan or some other fictional hero who kills for fun and profit. They
dream of living by their reflexes, of doing whatever is necessary with-
out regard to moral or legal restrictions. But few have the courage
or knowledge to make that dream a reality.

You might be like my friends -- interested but unsure, standing on
the sidelines afraid to play the game because you don't know the
rules. [But] within the pages of this book you will learn one of the
most successful methods of operation used by an independent con-
tractor. You will follow the procedures of a man who works alone,
without backing of organized crime or on a personal vendetta. Step
by step you will be taken from research to equipment selection to job
preparation to successful job completion. You will learn where to find
employment, how much to charge, and what you can, and cannot, do
with the money you earn.

But deny your urge to skip about, looking for the "good" parts.
Start where any amateur who is serious about turning professional
will start -- at the beginning.

[And when] [y]ou've read all the suggested material, you [will
have] honed your mind, body and reflexes into a precision piece of

4

professional machinery. You [will have] assembled the necessary tools and learned to use them efficiently. Your knowledge of dealing death [will have] increased to the point where you have a choice of methods. Finally, you [will be] confident and competent enough to accept employment.

[When you go to commit the murder, you will need] several (at least four or five pairs) of flesh-tone, tight-fitting surgical gloves. If these are not available, rubber gloves can be purchased at a reasonable price in the prescription department of most drug stores in boxes of 100. You will wear the gloves when you assemble and disassemble your weapons as well as on the actual job. Because the metal gun parts cause the rubber to wear quickly, it is a good practice to change and dispose of worn gloves several times during each operation.

[The bag you take to the kill also] should contain a few pairs of cheap handcuffs, usually available at pawn shops or army surplus stores.

Dress, as well as disguises, should be coordinated according to the job setting.

Black, dark brown or olive green clothes do not stand out and will probably appear at first glance to be a mechanic or delivery driver's uniform. . . . And underneath, you can wear your street clothes for a quick change after the job is completed.

The kill is the easiest part of the job. People kill one another every day. It takes no great effort to pull a trigger or plunge a knife. It is being able to do so in a manner that will not link yourself or your employer to the crime that makes you a professional.

[If you decide to kill your victim with a knife,] [t]he knife . . . should have a six-inch blade with a serrated edge for making efficient, quiet kills.

The knife should have a double-edged blade. This double edge, combined with the serrated section and six-inch length, will insure a deep, ragged tear, and the wound will be difficult, if not impossible, to close without prompt medical attention.

5

Make your thrusts to a vital organ and twist the knife before you withdraw it. If you hit bone, you will have to file the blade to remove the marks left on the metal when it struck the victim's bone.

Using your six inch, serrated blade knife, stab deeply into the side of the victim's neck and push the knife forward in a forceful movement. This method will half decapitate the victim, cutting both his main arteries and wind pipe, ensuring immediate death.

[You might also use an ice pick to murder your victim.] . . . An ice pick can . . . be driven into the victim's brain, through the ear, after he has been subdued. The wound hardly bleeds at all, and death is sometimes attributed to natural causes.

[If you plan to kill your victim with a gun,] you will learn [on the following pages] how to make, without need of special engineering ability or expensive machine shop tools, a silencer of the highest quality and effectiveness. The finished product attached to your 22 will be no louder than the noise made by a pellet gun. Because it is so inexpensive (mine cost less than twenty dollars to make), you can easily dispose of it after job use without any great loss. . . . Your first silencer will require possibly two days total to assemble . . . as you carefully follow the directions step by step. After you make a couple, it will become so easy, so routine, that you can whip one up in just a few hours.

The following items should be assembled before you begin [to build your silencer]:

- Drill rod, 7/32 inch (order from a machine shop if not obtainable locally)

- One foot of 1-1/2 inch (inside diameter) PVC tubing and two end caps

- One quart of fiberglass resin with hardener

- One yard thin fiberglass mat

[List continues]

6

[If you plan to kill your victim with a gun,][c]lose kills are by far preferred to shots fired over a long distance. You will need to know beyond any doubt that the desired result has been achieved.

When using a small caliber weapon like the 22, it is best to shoot from a distance of three to six feet. You will not want to be at point-blank range to avoid having the victim's blood splatter you or your clothing. At least three shots should be fired to ensure quick and sure death.

[If you plan to kill your victim from a distance,] use a rifle with a good scope and silencer and aim for the head -- preferably the eye sockets if you are a sharpshooter. Many people have been shot repeatedly, even in the head, and survived to tell about it.

The rifle has a ridge on top that will easily accept a scope, even though it is not cut for one. Put the scope in place, tighten it down, then sight it in. After sighting in, scratch a mark behind each scope clamp to allow remounting of the scope without resighting each time.

Extra clips are a must for both the rifle and pistol and should be carried as a precautionary measure. Hollow-point bullets are recom-mended because they deform on impact, making them nontraceable. As an added precaution, you can fill the hollows with liquid poison to insure success of your operation. . . . [Details follow]

To test your guns and ammunition, set up a sheet of quarter-inch plywood at distances of two to seven yards maximum for your pistol, and twenty to sixty yards maximum for your rifle. Check for penetra-tion of bullets at each range. Quarter-inch plywood is only a little stronger than the human skull.

If the serial number is on the barrel of the gun, grinding deeply enough to remove it may weaken the barrel to the point that the gun could explode in your face when fired. To make these numbers untraceable, [instructions follow].

[After shooting your victim] run a [specified tool] down the bore of the gun to change the ballistic markings. Do this even though you

7

intend to discard the crime weapon. . . . If, for some reason, you just can't bear to part with your weapon . . . alter the[specified parts of the gun according to the directions that follow].

Although several shots fired in succession offer quick and relatively humane death to the victim, there are instances when other methods of extermination are called for. The employer may want you to gather certain information from the mark before you do away with him. At other times, the assignment may call for torture or disfigurement as a "lesson" for the survivors.

There is no end to the various ways of torturing a mark until he would tell you what you want to know, and die just to get it over. Sometimes all it takes is putting a knife to his throat. Not from behind with the blade across the throat the way they do in the movies, but from the front with the tip of the blade creasing the soft hollow of the throat, where the victim can see the gleaming steel and realizes what damage it would do if fully penetrated.

The only time I can think of that explosives might be in order is when several marks will be together in one place at the same time, and you might be able to get them all with one shot. Notice that I stressed the word might. Shrapnel doesn't always kill. So in the aftermath, it will be your responsibility to enter the area and make sure that the desired result was accomplished.

[If you plan to kill your victim with a fertilizer bomb,] purchase a fifty pound bag of regular garden fertilizer from your garden center [and follow these detailed instructions for constructing the bomb]. Extend the fuse and light . . . .

Arson is a good method for covering a kill or creating an "accident."

Don't ever use gasoline or other traceable materials to start your fire. [Specified substance] is your best starter because it burns away all traces.

[In order to dispose of a corpse,] you can simply cut off the head after burying the body. Take the head to some deserted location,

8

place a stick of dynamite in the mouth, and blow the telltale dentition to smithereens! After this, authorities can't use the victim's dental records to identify his remains. As the body decomposes, fingerprints will disappear and no real evidence will be left from which to make positive identification. You can even clip off the fingertips and bury them separately.

[Or] you can always cut the body into sections and pack it into an ice chest for transport and disposal at various spots around the countryside.

If you choose to sink the corpse, you must first make several deep stabs into the body's lungs (from just under the rib cage) and belly. This is necessary because gases released during decomposition will bloat these organs, causing the body to rise to the surface of the water.

The corpse should be weighted with the standard concrete blocks, but it must be wrapped from head to toe with heavy chain as well, to keep the body from separating and floating in chunks to the surface. After the fishes and natural elements have done their work, the chain will drag the bones into the muddy sediment. . . .

If you bury the body, again deep stab wounds should be made to allow the gases to escape. A bloating corpse will push the earth up as it swells. Pour in lime to prevent the horrible odor of decomposition, and lye to make that decomposition more rapid.

[After you killed your first victim,] you felt absolutely nothing. And you are shocked by the nothingness. You had expected this moment to be a spectacular point in your life. You had wondered if you would feel compassion for the victim, immediate guilt, or even experience direct intervention by the hand of God. But you weren't even feeling sickened by the sight of the body.

After you have arrived home the events that took place take on a dreamlike quality. You don't dwell on them. You don't worry. You don't have nightmares. You don't fear ghosts. When thoughts of the hit go through your mind, it's almost as though you are recalling some show you saw on television.

9

By the time you collect the balance of your contract fee, the doubts and fears of discovery have faded. Those feelings have been replaced by cockiness, a feeling of superiority, a new independence and self-assurance.

[E]verything seems to have changed.

The people around you have suddenly become so aggravatingly ordinary. You start to view them as an irritating herd of pathetic sheep, doing as they are told, doing what is expected, following some-one, anyone, blindly. You can't believe how dumb your friends have become, and your respect diminishes for people you once held in awe.

You too have become different. You recognize that you made some mistakes, but you know what they were, and they will never plague you again. Next time (and you know there will be a next time), there will be no hesitation, no fear.

Your experience in facing death head-on has taught you about life. You have the power and ability to stand alone. You no longer need a reason to kill.

The things you have learned about life are important. You may wish to pass on your observations to someone you care about. When the bullshit starts to flow, you may feel compelled to set the record straight and tell those morons how it really is. When someone starts to brag, in confidence, about something he's done, the intimacy of the moment, the shared confessions, may inspire you to do a little brag-ging of your own. Or you may want to overawe some new woman in your life with your masculinity and you feel the urge to shock her just a little by hinting at your true profession.

Start now in learning to control your ego. That means, above all, keeping your mouth shut! You are a man. Without a doubt, you have proved it. You have come face to face with death and emerged the vic-tor through your cunning and expertise. You have dealt death as a professional. You don't need any second or third opinions to verify your manhood.

10

> Then, some day, when you've done and seen it all; when there doesn't seem to be any challenge left or any new frontier left to conquer, you might just feel cocky enough to write a book about it.

Selected passages from <u>Hit Man: A Technical Manual for Independent Contractors</u>.**1**

_____

I.

On the night of March 3, 1993, readied by these instructions and steeled by these seductive adjurations from <u>Hit Man: A Technical Manual for Independent Contractors</u>, a copy of which was subsequently found in his apartment, James Perry brutally murdered Mildred Horn, her eight-year-old quadriplegic son Trevor, and Trevor's nurse, Janice Saunders, by shooting Mildred Horn and Saunders through the eyes and by strangling Trevor Horn. Perry's despicable crime was not one of vengeance; he did not know any of his victims. Nor did he commit the murders in the course of another offense. Perry acted instead as a contract killer, a "hit man," hired by Mildred Horn's ex-husband, Lawrence Horn, to murder Horn's family so that Horn would receive the $2 million that his eight-year-old son had received in settlement for injuries that had previously left him paralyzed for life. At the time of the murders, this money was held in trust for the benefit of Trevor, and, under the terms of the trust instrument, the trust money was to be distributed tax-free to Lawrence in the event of Mildred's and Trevor's deaths.

In soliciting, preparing for, and committing these murders, Perry meticulously followed countless of <u>Hit Man</u>'s 130 pages of detailed factual instructions on how to murder and to become a professional killer.

_____

**1** The foregoing passages have been selected by the court as representative, both in substance and presentation, of the instructions in <u>Hit Man</u>. These are but a small fraction of the total number of instructions that appear in the 130-page manual. And the court has even felt it necessary to omit portions of these few illustrative passages in order to minimize the danger to the public from their repetition herein.

11

Perry, for example, followed many of the book's instructions on soliciting a client and arranging for a contract murder in his solicitation of and negotiation with Lawrence Horn. Cautioning against the placement of advertisements in military or gun magazines, as this might prompt "a personal visit from the FBI," Hit Man instructs that "as a beginner" one should solicit business "through a personal acquaintance whom you trust." Hit Man at 87. James Perry offered his services as a professional killer to Lawrence Horn through Thomas Turner, a "good friend" of Perry's, and Lawrence Horn's first cousin. State v. Perry, 344 Md. 204, 686 A.2d 274, 278 (1996), cert. denied, 117 S. Ct. 1318 (1997).

Hit Man instructs to request "expense money" from the employer prior to committing the crime, advising the contract killer to get "all expense money up front." Hit Man at 92 (emphasis added). The manual goes on to explain that this amount should generally range from five hundred to five thousand dollars, "depending on the type of job and the job location," and that the advance should be paid in cash. Id. Prior to commission of the murders, Lawrence Horn paid James Perry three thousand five hundred dollars through a series of wire transfers using phony names. Perry, 686 A.2d at 280.

Hit Man instructs that the victim's personal residence is the "initial choice" location for a murder and "an ideal place to make a hit," depending on its "layout" and "position." Hit Man at 81-82. James Perry murdered the Horns at their place of residence. Perry, 686 A.2d at 277.

Hit Man instructs its readers to use a rental car to reach the victim's location, Hit Man at 98, and to "steal an out-of-state tag" and use it to "replace the rental tag" on the car, explaining that "[s]tolen tags only show up on the police computer of the state in which they are stolen." Id. James Perry stole out-of-state tags and affixed them to his rental car before driving it to the Horns' residence on the night of the murders. Perry, 686 A.2d at 276.

Hit Man instructs the reader to establish a base at a motel in close proximity to the "jobsite" before committing the murders. Hit Man at 101. On the night that he killed Mildred and Trevor Horn and Janice Saunders, James Perry took a room at a Days Inn motel in Rockville,

12

Maryland, a short drive from the Horns' residence. Perry, 686 A.2d at 276.

Hit Man instructs that one should "use a made-up [license] tag number" when registering at the motel or hotel. Hit Man at 102. James Perry gave a false license tag number when he registered at the Days Inn on the night of the murders. Perry, 686 A.2d at 276.

Hit Man instructs that a "beginner" should use an AR-7 rifle to kill his victims. Hit Man at 21. James Perry used an AR-7 rifle to slay Mildred Horn and Janice Saunders. Perry, 686 A.2d at 279.

Hit Man instructs its readers where to find the serial numbers on an AR-7 rifle, and instructs them that, prior to using the weapon, they should "completely drill[ ] out" these serial numbers so that the weapon cannot be traced. Hit Man at 23. James Perry drilled out the serial numbers of his weapon exactly as the book instructs. Perry, 686 A.2d at 280.

Hit Man instructs in "explicit detail" (replete with photographs) how to construct, "without [the] need of special engineering ability or machine shop tools," a homemade, "whisper-quiet" silencer from material available in any hardware store. Hit Man at 39-51. James Perry constructed such a homemade silencer and used it on the night that he murdered Mildred and Trevor Horn and Janice Saunders. J.A. at 24.

Perry also followed any number of Hit Man's instructions on how to commit the murder itself. The manual, for example, instructs its readers to kill their "mark" at close range, so that they will "know beyond any doubt that the desired result has been achieved." Hit Man at 24. The book also cautions, however, that the killer should not shoot the victim at point blank range, because "the victim's blood [will] splatter [the killer] or [his] clothing." Id. Ultimately, the book recommends that its readers "shoot [their victims] from a distance of three to six feet." Id. James Perry shot Mildred Horn and Janice Saunders from a distance of three feet. J.A. at 24.

Hit Man specifically instructs its audience of killers to shoot the victim through the eyes if possible:

13

> At least three shots should be fired to insure quick and sure death. . . . [A]im for the head -- preferably the eye sockets if you are a sharpshooter.

Hit Man at 24. James Perry shot Mildred Horn and Janice Saunders two or three times and through the eyes. Perry, 686 A.2d at 277.

Finally, Perry followed many of Hit Man's instructions for concealing his murders. Hit Man instructs the killer to "[p]ick up those empty cartridges that were ejected when you fired your gun." Hit Man at 104. Although Perry fired his rifle numerous times during the murders, no spent cartridges were found in the area. Compare Perry, 686 A.2d at 277, with id. at 280.

Hit Man instructs the killer to disguise the contract murder as burglary by "mess[ing] the place up a bit and tak[ing] anything of value that you can carry concealed." Hit Man at 104. After killing Mildred and Trevor Horn and Janice Saunders, James Perry took a Gucci watch, as well as some credit cards and bank cards from Mildred Horn's wallet. Perry, 686 A.2d at 278. According to the police report, a few areas of the Horns' residence appeared "disturbed" or "slightly tossed," and "a rug and cocktail table in the living room had been moved." Id. at 277.

Hit Man instructs that, after murdering the victims, the killer should break down the AR-7 in order to make the weapon easier to conceal. Hit Man at 105. James Perry disassembled his weapon after the murders, in accordance with the instructions in Hit Man. Perry, 686 A.2d at 280.

Hit Man instructs killers to use specified tools to alter specified parts of the rifle. Hit Man at 25. The author explains that the described alterations will prevent the police laboratory from matching the bullets recovered from the victims' bodies to the murder weapon. James Perry altered his AR-7 in accordance with these instructions. Perry, 686 A.2d at 280.

Hit Man also instructs the killer to dispose of the murder weapon by scattering the disassembled pieces of the weapon along the road

14

as he leaves the crime scene. <u>Hit Man</u> at 105. And, after killing Mil-
dred and Trevor Horn and Janice Saunders, Perry scattered the pieces
of his disassembled AR-7 rifle along Route 28 in Montgomery
County. <u>Perry</u>, 686 A.2d at 280.

In this civil, state-law wrongful death action against defendant Pal-
adin Enterprises -- the publisher of <u>Hit Man</u> -- the relatives and rep-
resentatives of Mildred and Trevor Horn and Janice Saunders allege
that Paladin aided and abetted Perry in the commission of his murders
through its publication of <u>Hit Man</u>'s killing instructions. For reasons
that are here of no concern to the court, Paladin has <u>stipulated</u> to a
set of facts which establish as a matter of law that the publisher is civ-
illy liable for aiding and abetting James Perry in his triple murder,
unless the First Amendment absolutely bars the imposition of liability
upon a publisher for assisting in the commission of criminal acts. As
the parties stipulate: "The parties agree that the sole issue to be
decided by the Court . . . is whether the First Amendment is a com-
plete defense, as a matter of law, to the civil action set forth in the
plaintiffs' Complaint. All other issues of law and fact are specifically
reserved for subsequent proceedings." J.A. at 58.

Paladin, for example, has stipulated for purposes of summary judg-
ment that Perry followed the above-enumerated instructions from <u>Hit
Man</u>, as well as instructions from another Paladin publication, <u>How
to Make a Disposable Silencer, Vol. II</u>, in planning, executing, and
attempting to cover up the murders of Mildred and Trevor Horn and
Janice Saunders. J.A. at 61. Paladin has stipulated not only that, in
marketing <u>Hit Man</u>, Paladin "intended to attract and assist criminals
and would-be criminals who desire information and instructions on
how to commit crimes," J.A. at 59, but also that it "intended <u>and</u> had
knowledge" that <u>Hit Man</u> actually "would be used, <u>upon receipt</u>, by
criminals and would-be criminals to plan and execute the crime of
murder for hire." J.A. at 59 (emphasis added). Indeed, the publisher
has even stipulated that, through publishing and selling <u>Hit Man</u>, it
assisted Perry in particular in the perpetration of the very murders for
which the victims' families now attempt to hold Paladin civilly liable.
J.A. at 61.**2**

_____

**2** The full fact stipulation of the parties reads as follows:

15

Notwithstanding Paladin's extraordinary stipulations that it not only knew that its instructions might be used by murderers, but that

_____

JOINT STATEMENT OF FACTS

The parties agree that the matters set forth below represent facts that the plaintiffs and/or defendants would be able to establish by affidavit or otherwise in the context of defendants' motion for summary judgment under F.R.C.P. 56. These facts are offered only for the purposes of this motion and the parties specifically reserve the right to contest all statements which follow at any subsequent proceeding in this case. The parties agree that the sole issue to be decided by the Court in this motion is whether the First Amendment is a complete defense, as a matter of law, to the civil action set forth in the plaintiffs' Complaint. All other issues of law and fact are specifically reserved for subsequent proceedings.

1. Prior to March 3, 1993, Lawrence Horn began plotting with James Perry of Detroit, Michigan, to have Perry murder his ex-wife, Mildred Horn, and his son, Trevor.

2. On or about January 24, 1992, James Perry responded to a catalogue solicitation by the defendant, Paladin, advertising Hit Man: A Technical Manual for Independent Contractors (hereinafter referred to as "Hit Man"), and How to Make a Disposable Silencer, Volume 2 (hereinafter referred to as "Silencers"). Perry ordered both publications. Hit Man and Silencers were mailed to him by the defendants shortly thereafter.

3. Defendants had no other known contact with Perry and no contacts with Lawrence Horn.

4. Defendants concede, for purposes of this motion, and for no other purposes, that:

a. defendants engaged in a marketing strategy intended to attract and assist criminals and would-be criminals who desire information and instructions on how to commit crimes; and

b. in publishing, marketing, advertising and distributing Hit Man and Silencers, defendants intended and had knowledge that their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications.

c. The conditional factual concessions made in this ¶ 4 relate only to the defendants' state of mind, and do not preclude defendants from contending that defendants' published words, in and

of themselves, were neither directed at causing imminent unlaw-

16

it actually <u>intended</u> to provide assistance to murderers and would-be murderers which would be used by them "upon receipt," and that it

_____

ful action nor likely to produce such action, for purposes of the doctrine of <u>Brandenburg</u> v. <u>Ohio</u>, 395 U.S. 444 (1969).

5. Plaintiffs concede, for purposes of this motion and for no other purposes, that:

a. defendants' marketing strategy was and is intended to maximize sales of its publications to the public, including sales to (i) authors who desire information for the purpose of writing books about crime and criminals, (ii) law enforcement officers and agencies who desire information concerning the means and methods of committing crimes, (iii) persons who enjoy reading accounts of crimes and the means of committing them for purposes of entertainment, (iv) persons who fantasize about committing crimes but do not thereafter commit them, and (v) criminologists and others who study criminal methods and mentality.

b. in publishing, marketing, advertising and distributing <u>Hit Man</u> and <u>Silencers</u>, as well as other publications, defendants intended and had knowledge that their publications would be purchased by members of the general public, including those persons and for those purposes listed in ¶ 5(a).

c. The conditional factual concessions made in this ¶ 5 shall not preclude the plaintiffs from contending that such facts are irrelevant to any issue before this court.

6. On March 3, 1993, James Perry traveled from Detroit, Michigan to Montgomery County, Maryland and murdered Mildred Horn, Trevor Horn, and Janice Saunders, Trevor's private duty nurse. Perry followed a number of instructions outlined in <u>Hit Man</u> and <u>Silencers</u> (set forth in ¶ 7 below) in planning, executing and attempting to get away with the murders described in the complaint.

7. Defendants concede, for the purpose of this motion and for no other purposes, that in publishing, distributing and selling <u>Hit Man</u> and <u>Silencers</u> to Perry, defendants assisted him in the subsequent perpetration of the murders which are the subject of this litigation, in the ways set forth in paragraphs 18 and 19 of the Rice complaint and paragraphs 20 and 21 of the Saunders complaint which are incorporated by reference and are filed herewith as exhibit "D".

17

in fact assisted Perry in particular in the commission of the murders of Mildred and Trevor Horn and Janice Saunders, the district court granted Paladin's motion for summary judgment and dismissed plaintiffs' claims that Paladin aided and abetted Perry, holding that these claims were barred by the First Amendment as a matter of law.

Because long-established caselaw provides that speech -- even speech by the press -- that constitutes criminal aiding and abetting does not enjoy the protection of the First Amendment, and because we are convinced that such caselaw is both correct and equally applicable to speech that constitutes civil aiding and abetting of criminal conduct (at least where, as here, the defendant has the specific purpose of assisting and encouraging commission of such conduct and the alleged assistance and encouragement takes a form other than abstract advocacy), we hold, as urged by the Attorney General and the Department of Justice, that the First Amendment does not pose a bar to a finding that Paladin is civilly liable as an aider and abetter of Perry's triple contract murder. We also hold that the plaintiffs have stated against Paladin a civil aiding and abetting claim under Mary-

_____

8. Hit Man was first published in 1983 and Silencers was first published in 1983. Approximately 13,000 copies of Hit Man and an unknown but not disproportionate number of copies of Silencers have been sold nationally.

9. At all relevant times, defendants had no specific knowledge (1) that either Perry or Horn planned to commit a crime; (2) that Perry and Horn had entered into a conspiracy for the purpose of committing a crime; and (3) that Perry had been retained by Horn to murder Mildred Horn, Trevor Horn, or Janice Saunders.

10. The defendants' current catalogue, and publications Hit Man and Silencers are filed herewith by the parties as exhibits A, B and C, respectively.

11. The parties may file affidavits or supplement but not alter the foregoing stipulation. Plaintiffs reserve the right to challenge defendants' affidavits declarations with counter-affidavits or pursuant to F.R.C.P. 56.

J.A. at 58-62.

land law sufficient to withstand Paladin's motion for summary judgment. For these reasons, which we fully explain below, the district court's grant of summary judgment in Paladin's favor is reversed and the case is remanded for trial.

II.

A.

In the seminal case of Brandenburg v. Ohio, 395 U.S. 444 (1969), the Supreme Court held that abstract advocacy of lawlessness is protected speech under the First Amendment. Although the Court provided little explanation for this holding in its brief per curiam opinion, it is evident the Court recognized from our own history that such a right to advocate lawlessness is, almost paradoxically, one of the ultimate safeguards of liberty. Even in a society of laws, one of the most indispensable freedoms is that to express in the most impassioned terms the most passionate disagreement with the laws themselves, the institutions of, and created by, law, and the individual officials with whom the laws and institutions are entrusted. Without the freedom to criticize that which constrains, there is no freedom at all.

However, while even speech advocating lawlessness has long enjoyed protections under the First Amendment, it is equally well established that speech, which, in its effect, is tantamount to legitimately proscribable nonexpressive conduct, may itself be legitimately proscribed, punished, or regulated incidentally to the constitutional enforcement of generally applicable statutes. Cf. Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991) (noting "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news"). As no less a First Amendment absolutist than Justice Black wrote for the Supreme Court almost fifty years ago in Giboney v. Empire Storage & Ice Co., in rejecting a First Amendment challenge to an injunction forbidding unionized distributors from picketing to force an illegal business arrangement:

It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or

19

writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now. . . .

 . . .

 . . . It is true that the agreements and course of conduct here were as in most instances brought about through speaking or writing. But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society.

336 U.S. 490, 498, 502 (1949) (citations omitted). And as the Court more recently reaffirmed:

Although agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment. The fact that such an agreement necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech. [W]hile a solicitation to enter into an agreement arguably crosses the sometimes hazy line distinguishing conduct from pure speech, such a solicitation, even though it may have an impact in the political arena, remains in essence an invitation to engage in an illegal exchange for private profit, and may properly be prohibited.

Brown v. Hartlage, 456 U.S. 45, 55 (1982); see also Osborne v. Ohio, 495 U.S. 103, 110 (1990) (quoting Giboney, 336 U.S. at 498); New York v. Ferber, 458 U.S. 747, 761-62 (1982) (same); Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978) (quoting Giboney, 336 U.S. at 502); National Organization for Women v. Operation Rescue, 37 F.3d 646, 656 (D.C. Cir. 1994) ("That `aiding and abetting' of an

20

illegal act may be carried out through speech is no bar to its illegality."); United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) ("[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself."); Laurence H. Tribe, American Constitutional Law 837 (2d ed. 1988) ("[T]he law need not treat differently the crime of one man who sells a bomb to terrorists and that of another who publishes an instructional manual for terrorists on how to build their own bombs out of old Volkswagen parts.").

Were the First Amendment to bar or to limit government regulation of such "speech brigaded with action," Brandenburg, 395 U.S. at 456 (Douglas, J., concurring), the government would be powerless to protect the public from countless of even the most pernicious criminal acts and civil wrongs. See, e.g., Model Penal Code § 223.4 (extortion or blackmail); id. § 240.2 (threats and other improper influences in official and political matters); id. § 241 (perjury and various cognate crimes); id. § 5.02 and § 2.06(3)(a)(i) (criminal solicitation); 18 U.S.C. § 871 (threatening the life of the President); Model Penal Code § 5.03 (conspiracy); id. § 250.4 (harassment); id. § 224.1 (forgery);id. § 210.5(2) (successfully soliciting another to commit suicide); id. § 250.3 (false public alarms); and the like. As Professor Greenawalt succinctly summarized:

> The reasons of ordinary penal policy for covering communicative efforts to carry out ordinary crimes are obvious, and the criminal law sensibly draws no distinction between communicative and other acts. Although assertions of fact generally fall within a principle of freedom of speech, what these sorts of factual statements contribute to the general understanding of listeners is minimal, and the justifications for free speech that apply to speakers do not reach communications that are simply means to get a crime successfully committed.

Greenawalt, Speech, Crime, and the Uses of Language at 85 (1989).

In particular as it concerns the instant case, the speech-act doctrine has long been invoked to sustain convictions for aiding and abetting the commission of criminal offenses. Indeed, every court that has addressed the issue, including this court, has held that the First

21

Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word.

Thus, in a case indistinguishable in principle from that before us, the Ninth Circuit expressly held in United States v. Barnett, 667 F.2d 835 (9th Cir. 1982), that the First Amendment does not provide publishers a defense as a matter of law to charges of aiding and abetting a crime through the publication and distribution of instructions on how to make illegal drugs. In rejecting the publisher's argument that there could be no probable cause to believe that a crime had been committed because its actions were shielded by the First Amendment, and thus a fortiori there was no probable cause to support the search pursuant to which the drug manufacturing instructions were found, the Court of Appeals explicitly foreclosed a First Amendment defense not only to the search itself, but also to a later prosecution:

> To the extent . . . that Barnett appears to contend that he is immune from search or prosecution because he uses the printed word in encouraging and counseling others in the commission of a crime, we hold expressly that the first amendment does not provide a defense as a matter of law to such conduct.

Id. at 843 (emphasis in original); see also id. at 842 ("The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes, including that of aiding and abetting, frequently involve the use of speech as part of the criminal transaction."). The Ninth Circuit derided as a "specious syllogism" with "no support in the law" the publisher's argument that the First Amendment protected his sale of the instruction manual simply because the First Amendment protects the written word. Id. at 842.

The principle of Barnett, that the provision of instructions that aid and abet another in the commission of a criminal offense is unprotected by the First Amendment, has been uniformly accepted, and the principle has been applied to the aiding and abetting of innumerable crimes.

22

Notably, then-Judge Kennedy, in express reliance upon <u>Barnett</u>, invoked the principle in <u>United States</u> v. <u>Freeman</u> to sustain convictions for the aiding and abetting of tax fraud. 761 F.2d 549, 552-53 (9th Cir. 1985), <u>cert</u>. <u>denied</u>, 476 U.S. 1120 (1986). In <u>Freeman</u>, the Ninth Circuit concluded that the defendant could be held criminally liable for counseling tax evasion at seminars held in protest of the tax laws, even though the speech that served as the predicate for the conviction "spr[ang] from the anterior motive to effect political or social change." 761 F.2d at 551. Said the court:

> [T]he First Amendment is quite irrelevant if the intent of the actor and the objective meaning of the words used are so close in time and purpose to a substantive evil as to become part of the ultimate crime itself. In those instances, where speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone.

<u>Id</u>. at 552 (citations omitted). Thus, the court held that a First Amendment instruction was required only for those counts as to which there was evidence that the speaker "directed his comments at the unfairness of the tax laws generally, without soliciting or counseling a violation of the law in an immediate sense [and] made statements that, at least arguably, were of abstract generality, remote from advice to commit a specific criminal act." <u>Id</u>. at 551-52. For those counts as to which the defendant, through his speech, directly assisted in the preparation and review of false tax returns, the court held that the defendant was not entitled to a First Amendment instruction at all. <u>Id</u>. at 552. <u>See also United States</u> v. <u>Mendelsohn</u>, 896 F.2d 1183, 1186 (9th Cir. 1990) (holding <u>Brandenburg</u> inapplicable to a conviction for conspiring to transport and aiding and abetting the interstate transportation of wagering paraphernalia, where defendants disseminated a computer program that assisted others to record and analyze bets on sporting events; program was "too instrumental in and intertwined with the performance of criminal activity to retain first amendment protection").

Our own circuit, and every other circuit to address the issue, has likewise concluded that the First Amendment is generally inapplicable to charges of aiding and abetting violations of the tax laws. <u>See</u>,

23

e.g., United States v. Kelley, 769 F.2d 215 (4th Cir. 1985); United States v. Rowlee, 899 F.2d 1275 (2d Cir. 1990), cert. denied, 498 U.S. 828 (1990); United States v. Moss, 604 F.2d 569 (8th Cir. 1979), cert. denied, 444 U.S. 1071 (1980); United States v. Buttorff, 572 F.2d 619, 623-24 (8th Cir. 1978) (holding that tax evasion speeches were not subject to Brandenburg because, although they did not "incite the type of imminent lawless activity referred to in criminal syndicalism cases," they did "go beyond mere advocacy of tax reform"), cert. denied, 437 U.S. 906 (1978).

Thus, in Kelley, we held that a defendant who "participate[d]" in the preparation of false tax forms for others by telling listeners "what to do and how to prepare the forms" and by supplying forms and materials was not entitled to the protections of the First Amendment, 769 F.2d at 217, even though the defendant offered his advice in a meeting of a group concededly dedicated to the political belief "that the federal income tax is unconstitutional as applied to wages," id. at 216. We observed, as the Ninth Circuit did with respect to the claim made in Barnett, that,

> [t]he claim of First Amendment protection of [Kelley's] speech is frivolous. His was no abstract criticism of income tax laws. His listeners were not urged to seek congressional action to exempt wages from income taxation. Instead, they were urged to file false returns, with every expectation that the advice would be heeded.
>
> The cloak of the First Amendment envelops critical, but abstract, discussions of existing laws, but lends no protection to speech which urges the listeners to commit violations of current law. Brandenburg v. Ohio, 395 U.S. 444, 89 S. Ct. 1827; United States v. Buttorff, 572 F.2d 619 (8th Cir. 1978). It was no theoretical discussion of non-compliance with laws; action was urged; the advice was heeded, and false forms were filed.

Kelley, 769 F.2d at 217. Analogously, we held in United States v. Fleschner, 98 F.3d 155 (4th Cir. 1996), cert. denied, 117 S. Ct. 2484 (1997), that defendants who instructed and advised meeting attendees to file unlawful tax returns were not entitled to a First Amendment

24

jury instruction on the charge of conspiracy to defraud the United States of income tax revenue because "[t]he defendants' words and acts were not remote from the commission of the criminal acts." 98 F.3d at 158-59.

Indeed, as the Department of Justice recently advised Congress, the law is now well established that the First Amendment, and Brandenburg's "imminence" requirement in particular, generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting, because "culpability in such cases is premised, not on defendants' `advocacy' of criminal conduct, but on defendants' successful efforts to assist others by detailing to them the means of accomplishing the crimes." Department of Justice, "Report on the Availability of Bombmaking Information, the Extent to Which Its Dissemination is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the United States Constitution" 37 (April 1997) (footnote omitted) [hereinafter "DOJ Report"]; see also id. ("[T]he question of whether criminal conduct is `imminent' is relevant for constitutional purposes only where, as in Brandenburg itself, the government attempts to restrict advocacy, as such.").**3** And, while

---

**3** Congress, in the Antiterrorism and Effective Death Penalty Act of 1996 ["the AEDPA"], Pub. L. No. 104-132, 110 Stat. 1214, 1297, required the Attorney General to conduct a study concerning, inter alia, the extent to which there is available public access to materials instructing on "how to make bombs, destructive devices, or weapons of mass destruction"; the application of then-existing federal laws to such materials; and the extent to which the First Amendment protects such materials and their private and commercial distribution. The statutory mandate to the Attorney General was prompted by legislation proposed by Senators Feinstein and Biden in the aftermath of the Oklahoma City bombing, which would criminalize the teaching or demonstration of the manufacture of explosive materials "if the person intends or knows that such explosive materials or information will likely be used for, or in furtherance of" specified criminal offenses.

The AEDPA required the Attorney General to submit to the Congress a report on these subjects and to make that report available to the public. Recognizing that the exhaustive legal analysis set forth in that report was directly relevant to the issues pending before us, the parties jointly

25

there is considerably less authority on the subject, we assume that those speech acts which the government may criminally prosecute with little or no concern for the First Amendment, the government may likewise subject to civil penalty or make subject to private causes of action. Compare Garrison v. Louisiana, 379 U.S. 64 (1964) (applying the same "actual malice" standard to both criminal libel prosecutions and private defamation actions) with New York Times Co. v. Sullivan, 376 U.S. 254 (1964). Cf. Cohen, 501 U.S. 663 (finding in civil promissory estoppel case that First Amendment does not bar liability for newspaper's publication of confidential source's name); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) (First Amendment does not bar liability for common law tort of unlawful appropriation of "right to publicity" where television station broadcast "human cannonball" act in its entirety without plaintiff's authorization); Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985) (rejecting First Amendment defense to copyright infringement action against magazine for printing unauthorized presidential memoir excerpts). Even if this is not universally

_____

moved for, and we granted them, permission to file the report with the court. The decision we reach today, which, as noted, was urged upon us by Attorney General Reno and the Department of Justice, follows from the principal conclusion reached by the Attorney General and the Department in that report:

> The First Amendment would impose substantial constraints on any attempt to proscribe indiscriminately the dissemination of bombmaking information. The government generally may not, except in rare circumstances, punish persons either for advocating lawless action or for disseminating truthful information -- including information that would be dangerous if used -- that such persons have obtained lawfully. However, the constitutional analysis is quite different where the government punishes speech that is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit; such"speech acts" -- for instance, many cases of inchoate crimes such as aiding and abetting and conspiracy -- may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech.

DOJ Report at 2 (emphasis added).

26

so, we believe it must be true at least where the government's interest in preventing the particular conduct at issue is incontrovertibly compelling.

B.

We can envision only two possible qualifications to these general rules, neither of which, for reasons that we discuss more extensively below, is of special moment in the context of the particular aiding and abetting case before us.

1.

The first, which obviously would have practical import principally in the civil context, is that the First Amendment may, at least in certain circumstances, superimpose upon the speech-act doctrine a heightened intent requirement in order that preeminent values underlying that constitutional provision not be imperiled. See, e.g., New York Times, 376 U.S. 254; cf. United States v. Aguilar, 515 U.S. 593, 605 (1995) (rejecting defendant's First Amendment construction in part because "the statute here in question does not impose such a restriction [on the disclosure of wiretap authorizations] generally, but only upon those who disclose wiretap information`in order to [ob]struct, impede, or prevent' a wiretap interception" (emphasis added)); Haig v. Agee, 453 U.S. 280, 308-09 (1981) ("[The defendant's] disclosures, among other things, have the declared purpose of obstructing intelligence operations and the recruiting of intelligence personnel. They are clearly not protected by the Constitution." (emphasis added)); United States v. Featherston, 461 F.2d 1119, 1122 (5th Cir. 1972) (rejecting First Amendment challenge to federal statute criminalizing the teaching or demonstration of the making of any explosive device after construing statute to require"intent or knowledge that the information disseminated would be used in the furtherance of a civil disorder"), cert. denied, 409 U.S. 991 (1972); National Mobilization Committee to End the War in Viet Nam v. Foran, 411 F.2d 934, 937 (7th Cir. 1969). That is, in order to prevent the punishment or even the chilling of entirely innocent, lawfully useful speech, the First Amendment may in some contexts stand as a bar to the imposition of liability on the basis of mere foreseeability or knowledge that the information one imparts could be misused for an imper-

27

missible purpose. Where it is necessary, such a limitation would meet the quite legitimate, if not compelling, concern of those who publish, broadcast, or distribute to large, undifferentiated audiences, that the exposure to suit under lesser standards would be intolerable. See discussion infra, Part IV. At the same time, it would not relieve from liability those who would, for profit or other motive, intentionally assist and encourage crime and then shamelessly seek refuge in the sanctuary of the First Amendment. Like our sister circuits, at the very least where a speaker -- individual or media -- acts with the purpose of assisting in the commission of crime, we do not believe that the First Amendment insulates that speaker from responsibility for his actions simply because he may have disseminated his message to a wide audience. See, e.g., Barnett, 667 F.2d 835 (holding that drug manufacturing instructions mailed to countless customers with whom the defendant had no personal contact could give rise to aiding and abetting conviction); Mendelsohn, 896 F.2d 1183 (holding that First Amendment did not forbid prosecution of aiding and abetting interstate transportation of wagering paraphernalia where computer programs for recording and analyzing illegal wagers were distributed generally and widely to the public); Buttorff, 572 F.2d at 622-23 (affirming, despite First Amendment challenges, convictions for providing tax-evasion information at "large public gatherings" to participants whom the defendants did not personally meet); Kelley, 769 F.2d 215 (similar); Moss, 604 F.2d 569 (similar); Freeman, 761 F.2d 549 (similar). This is certainly so, we are satisfied, where not only the speaker's dissemination or marketing strategy, but the nature of the speech itself, strongly suggest that the audience both targeted and actually reached is, in actuality, very narrowly confined, as in the case before us. See discussion infra at 39-44. Were the First Amendment to offer protection even in these circumstances, one could publish, by traditional means or even on the internet, the necessary plans and instructions for assassinating the President, for poisoning a city's water supply, for blowing up a skyscraper or public building, or for similar acts of terror and mass destruction, with the specific, indeed even the admitted, purpose of assisting such crimes -- all with impunity.

We need not engage in an extended discussion of the existence or scope of an intent-based limitation today, however, because we are confident that the First Amendment poses no bar to the imposition of

28

civil (or criminal) liability for speech acts which the plaintiff (or the prosecution) can establish were undertaken with specific, if not criminal, intent. See DOJ Report at 42-43 (advising that "the government may punish publication of dangerous instructional information where that publication is motivated by a desire to facilitate the unlawful [conduct as to which the instructions inform, or] [a]t the very least, publication with such an improper intent should not be constitutionally protected where it is foreseeable that the publication will be used for criminal purposes . . . ."). In fact, this conclusion would seem to follow a fortiori from the Supreme Court's holding in New York Times, 376 U.S. 254, allowing the imposition of civil tort liability on a media defendant for reputational injury caused by mere reckless disregard of the truth of its published statements. And, here, as previously noted, see also discussion infra at 37-38, Paladin has stipulated that it provided its assistance to Perry with both the knowledge and the intent that the book would immediately be used by criminals and would-be criminals in the solicitation, planning, and commission of murder and murder for hire, and even absent the stipulations, a jury could reasonably find such specific intent, see discussion infra at 38-42. Thus, Paladin has stipulated to an intent, and a jury could otherwise reasonably find that Paladin acted with a kind and degree of intent, that would satisfy any heightened standard that might be required by the First Amendment prerequisite to the imposition of liability for aiding and abetting through speech conduct.**4**

2.

The second qualification is that the First Amendment might well (and presumably would) interpose the same or similar limitations upon the imposition of civil liability for abstract advocacy, without more, that it interposes upon the imposition of criminal punishment for such advocacy. In other words, the First Amendment might well circumscribe the power of the state to create and enforce a cause of

---

**4** In addition to their aiding and abetting counts, which require that Paladin have acted knowingly or intentionally, the plaintiffs also brought claims sounding inter alia in negligence and strict liability. The district court did not address these claims and we do not do so herein. We leave to the district court on remand the task of addressing these counts in the first instance.

action that would permit the imposition of civil liability, such as aiding and abetting civil liability, for speech that would constitute pure abstract advocacy, at least if that speech were not "directed to inciting or producing imminent lawless action, and . . . likely to incite or produce such action." Brandenburg, 395 U.S. at 447. The instances in which such advocacy might give rise to civil liability under state statute would seem rare, but they are not inconceivable. Cf. Schenck v. United States, 249 U.S. 47 (1919) (criminal conspiracy prosecution predicated upon subversive advocacy); Frohwerk v. United States, 249 U.S. 204 (1919) (same); Debs v. United States, 249 U.S. 211 (1919) (criminal attempt prosecution predicated upon such advocacy). Again, however, an exhaustive analysis of this likely limitation is not required in this case.

Here, it is alleged, and a jury could reasonably find, see discussion infra Part III.A, that Paladin aided and abetted the murders at issue through the quintessential speech act of providing step-by-step instructions for murder (replete with photographs, diagrams, and narration) so comprehensive and detailed that it is as if the instructor were literally present with the would-be murderer not only in the preparation and planning, but in the actual commission of, and follow-up to, the murder; there is not even a hint that the aid was provided in the form of speech that might constitute abstract advocacy. As the district court itself concluded, Hit Man "merely teaches what must be done to implement a professional hit." J.A. at 218. Moreover, although we do not believe such would be necessary, we are satisfied a jury could readily find that the provided instructions not only have no, or virtually no, noninstructional communicative value, but also that their only instructional communicative "value" is the indisputably illegitimate one of training persons how to murder and to engage in the business of murder for hire. See id.; see also id. at 221 ("This Court, quite candidly, personally finds Hit Man to be reprehensible and devoid of any significant redeeming social value").

Aid and assistance in the form of this kind of speech bears no resemblance to the "theoretical advocacy," Scales v. United States, 367 U.S. 203, 235 (1961), the advocacy of "principles divorced from action," Yates v. United States, 354 U.S. 298, 320 (1957), overruled on other grounds, Burks v. United States, 437 U.S. 1 (1978), the "doctrinal justification," id. at 321,"the mere abstract teaching [of]

30

the moral propriety or even moral necessity for a resort to force and violence," Brandenburg, 395 U.S. at 448 (quoting Noto v. United States, 367 U.S. 290, 297-98 (1961)), or any of the other forms of discourse critical of government, its policies, and its leaders, which have always animated, and to this day continue to animate, the First Amendment. Indeed, this detailed, focused instructional assistance to those contemplating or in the throes of planning murder is the antithesis of speech protected under Brandenburg. It is the teaching of the "techniques" of violence, Scales, 367 U.S. at 233, the "advocacy and teaching of concrete action," Yates, 354 U.S. at 320, the "prepar[ation] . . . for violent action and [the] steeling . . . to such action," Brandenburg, 395 U.S. at 448 (quoting Noto, 367 U.S. at 297-98). It is the instruction in the methods of terror of which Justice Douglas spoke in Dennis v. United States, when he said, "If this were a case where those who claimed protection under the First Amendment were teaching the techniques of sabotage . . . I would have no doubts. The freedom to speak is not absolute; the teaching of methods of terror . . . should be beyond the pale . . . ." 341 U.S. 494, 581 (1951) (Douglas, J., dissenting). As such, the murder instructions in Hit Man are, collectively, a textbook example of the type of speech that the Supreme Court has quite purposely left unprotected, and the prosecution of which, criminally or civilly, has historically been thought subject to few, if any, First Amendment constraints. Accordingly, we hold that the First Amendment does not pose a bar to the plaintiffs' civil aiding and abetting cause of action against Paladin Press. If, as precedent uniformly confirms, the states have the power to regulate speech that aids and abets crime, then certainly they have the power to regulate the speech at issue here.

III.

The district court's contrary conclusion, reached in an initial and then an amended opinion, must be attributed ultimately, we believe, to that court's failure at the time of its initial ruling to realize that Maryland does recognize a civil cause of action for aiding and abetting. Once the court's error with respect to the existence in Maryland of a civil aiding and abetting cause of action was brought to the court's attention by the parties on motion for reconsideration, it appears that the court was simply unprepared to revisit its decision, issued only the week before, in order to address the above-discussed

31

cases, which the district court itself had observed are "factually similar" to the case at hand, J.A. at 156, but which the court had distinguished on the ground that they involved <u>criminal</u> prosecutions for aiding and abetting and Maryland does not provide a <u>civil</u> cause of action for aiding and abetting. J.A. at 155 ("Plaintiffs are asking the Court to allow the Defendants to be subjected to <u>civil</u> liability for murder, based on a theory of civil aiding and abetting - <u>a claim that does not exist under Maryland law</u>." (emphases added)). Perhaps ironically, this unwillingness foreordained what was, as we explain below, the district court's second error in the interpretation of Maryland law -- its holding, on reconsideration, that Maryland would not recognize aiding and abetting liability under the facts as stipulated by the parties to this litigation, or on the facts as they appear from the record.

Whatever doubts the district court may have harbored about its interpretation of Maryland aiding and abetting law were almost certainly eased because it concluded alternatively (albeit in <u>dicta</u>) that <u>Hit Man</u> is entitled to the protections of <u>Brandenburg</u> in any event because it is a mere instructional manual for, and not an incitement to, murder. However, in this conclusion the district court erred as well, misunderstanding the Supreme Court's decision in <u>Brandenburg</u> to protect not just abstract advocacy of lawlessness and the open criticism of government and its institutions, but also the teaching of the technical methods of criminal activity -- in this case, the technical methods of murder.

A.

In its initial memorandum opinion, the district court rejected the plaintiffs' principal argument, that the First Amendment does not bar the imposition of liability for the aiding and abetting of murder, on the ground that the State of Maryland does not recognize a civil cause of action for aiding and abetting:

>  Plaintiffs argue that <u>Hit Man</u> is not protected by the First Amendment because the First Amendment does not protect communication aiding and abetting murder. This argument must fail, however, because Plaintiffs do not cite, nor has the Court located, any reported decision that suggests that

32

> Maryland recognizes the tort of aiding and abetting. A federal court sitting in diversity cannot create new causes of action. Therefore, the Court cannot create a cause of action for aiding and abetting under Maryland law . . . .

J.A. at 153-54 (footnote and citations omitted). In response to submissions by both parties filed the very next day informing the court that Maryland does recognize civil aiding and abetting, the district court was obliged to amend its memorandum opinion to acknowledge the overwhelming authority that Maryland does, in fact, recognize such a cause of action. However, rather than address then the numerous precedents holding that the First Amendment offers little protection against claims of aiding and abetting criminal conduct, which in its initial opinion the court had agreed were similar to the instant case, the district court thereafter merely added to its original memorandum opinion the single conclusory footnote sentence (together with the necessary conforming changes to the relevant paragraph from its initial opinion[5]) that, "[a]lthough Maryland appears to recognize aider and abetter tort liability, it has never been applied to support liability in this context." J.A. at 205 n.2 (internal citation deleted).[6] In this

_____

[5] Thus, in relevant part, the amended opinion reads as follows:

> Plaintiffs argue that <u>Hit Man</u> is not protected by the First Amendment because the First Amendment does not protect communication aiding and abetting murder. This argument, the Court believes, fails, however, because of the absence of any reported decision suggesting that Maryland <u>extends</u> the tort of aiding and abetting to the circumstances of this case. A federal court sitting in diversity cannot create new causes of action. Therefore, the Court cannot <u>apply a new theory or extend the tort of aiding and abetting</u> under Maryland law . . . .

J.A. at 205-06 (footnote and citations omitted; emphases added). As evidence of the haste with which the revised analysis was undertaken, the amended opinion elsewhere still includes a statement of the district court's initial conclusion that Maryland does not provide a civil cause of action for aiding and abetting. <u>See id</u>. at 207 ("Plaintiffs are asking the Court to allow the Defendants to be subjected to civil liability for murder, based on a theory of civil aiding and abetting - a claim that does not exist under Maryland law.").

[6] The issue of whether, under the stipulated facts, Paladin could be held liable for aiding and abetting under Maryland law was not even before

33

holding, as with its original holding that Maryland did not recognize a cause of action for civil aiding and abetting, the district court erred.

Maryland's highest court has held that a defendant may be liable in tort if he "by any means (words, signs, or motions) encourage[s], incite[s], aid[s] or abet[s] the act of the direct perpetrator of the tort." Alleco Inc. v. Harry & Jeanette Weinberg Foundation, 340 Md. 176, 665 A.2d 1038, 1049 (1995) (quoting Duke v. Feldman, 245 Md. 454, 226 A.2d 345, 347 (1967)). It further appears that generally Maryland defines the tort of aiding and abetting in the same way that it defines the crime of aiding and abetting. The state defines "aider" as one who "assist[s], support[s] or supplement[s] the efforts of another," and defines "abettor" as "one who instigates, advises or encourages the commission of a crime." Anello v. State, 201 Md. 164, 93 A.2d 71, 72-73 (Md. 1952). The Court of Appeals has explained that in order for a conviction to stand, "it is not essential that there be a prear-ranged concert of action, although, in the absence of such action, it is essential that [the defendant] should in some way advocate or encourage the commission of the crime." Id. And, recently, the court has reiterated that criminal aiding and abetting "may be predicated upon counseling or encouraging" a criminal act, even if there is no agreement between the principal and the aider or abettor, and also that "[i]t is well settled that aiding and abetting does not always require a conspiracy." Apostoledes v. State, 323 Md. 456, 593 A.2d 1117, 1121 (1991).

The primary, and possibly only, difference between Maryland's civil and criminal laws of aiding and abetting is the intent require-ment. As Judge Learned Hand explained in discussing generally the difference between civil and criminal aiding and abetting laws, the intent standard in the civil tort context requires only that the criminal conduct be the "natural consequence of [one's] original act," whereas criminal intent to aid and abet requires that the defendant have a "pur-

_____

the district court. In fact, the parties had expressly stipulated that "[t]he parties agree that the sole issue to be decided by the Court in this motion is whether the First Amendment is a complete defense, as a matter of law, to the civil action set forth in the plaintiffs' Complaint. All other issues of law and fact are specifically reserved for subsequent proceed-ings." J.A. 58-59.

posive attitude" toward the commission of the offense. United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938); see also Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) (adopting Judge Hand's view of the criminal intent requirement). We assume that Maryland prescribes a higher intent standard for the imposition of criminal liability than it does for civil liability.

Especially in light of the caselaw discussed above, we are satisfied not only that the Maryland courts would conclude that an aiding and abetting cause of action would lie in the circumstances of this case, but also that plaintiffs have, by way of stipulation and otherwise, established a genuine issue of material fact as to each element of that cause of action. Perhaps most importantly in this regard, we conclude that plaintiffs have more than met their burden of establishing a genuine issue of material fact as to Paladin's intent, even assuming that the First Amendment erects a heightened standard from that required under Maryland state law.

Paladin itself has stipulated that "Perry followed a number of instructions outlined in Hit Man" in preparing for and in murdering Mildred and Trevor Horn and Janice Saunders. J.A. at 61. In fact, as noted, the publisher has actually stipulated that it assisted Perry in the "perpetration of the murders." Id.

Even without these express stipulations of assistance, however, a reasonable jury could conclude that Paladin assisted Perry in those murders, from the facts that Perry purchased and possessed Hit Man and that the methods and tactics he employed in his murders of Mildred and Trevor Horn and Janice Saunders so closely paralleled those prescribed in the book. As discussed above, see discussion supra Part I, Perry followed, in painstaking detail, countless of the book's instructions in soliciting, preparing for, and carrying out his murders. Without repeating these in detail here, Perry faithfully followed the book's instructions in making a home-made silencer, using a rental car with stolen out-of-state tags, murdering the victims in their own home, using an AR-7 rifle to shoot the victims in the eyes from point blank range, and concealing his involvement in the murders. The number and extent of these parallels to the instructions in Hit Man cannot be consigned, as a matter of law, to mere coincidence; the correspondence of techniques at least creates a jury issue as to whether

35

the book provided substantial assistance, if it does not conclusively establish such assistance.

A jury likewise could reasonably find that Perry was encouraged in his murderous acts by Paladin's book. Hit Man does not merely detail how to commit murder and murder for hire; through powerful prose in the second person and imperative voice, it encourages its readers in their specific acts of murder. It reassures those contemplating the crime that they may proceed with their plans without fear of either personal failure or punishment. And at every point where the would-be murderer might yield either to reason or to reservations, Hit Man emboldens the killer, confirming not only that he should proceed, but that he must proceed, if he is to establish his manhood. See discussion infra at 54-56. The book is so effectively written that its protagonist seems actually to be present at the planning, commission, and cover-up of the murders the book inspires. Illustrative of the nature and duration of the criminal partnership established between Hit Man and its readers who murder is the following "dialogue" that takes place when the murderer returns from his first killing:

> I'm sure your emotions have run full scale over the past few days or weeks.
>
> There was a fleeting moment just before you pulled the trigger when you wondered if lightning would strike you then and there. And afterwards, a short burst of panic as you looked quickly around you to make sure no witnesses were lurking.
>
> But other than that, you felt absolutely nothing. And you are shocked by that nothingness. You had expected this moment to be a spectacular point in your life. . . .
>
> The first few seconds of nothingness give you an almost uncontrollable urge to laugh out loud. You break into a wide grin. Everything you have been taught about life and its value was a fallacy.

Hit Man at 107. As this and other cases reveal, the book is arrestingly effective in the accomplishment of its objectives of counseling others to murder and assisting them in its commission and cover-up.

36

Finally, and significantly, Paladin also has stipulated to an intent that readily satisfies that required under Maryland law or the First Amendment. Even if the First Amendment imposes a heightened intent-based limitation on the state's ability to apply the tort of aiding and abetting to speech, see discussion supra at II.B.1, we are confident that, at the very least, the aiding and abetting of a malum in se crime such as murder with the specific purpose of assisting and encouraging another or others in that crime would satisfy such a limitation. Paladin has stipulated not only that it had knowledge that its publication would be used upon receipt by murderers and other criminals in the commission of murder, but that it even intended that the book be so used. Thus, the publisher stipulated, "defendants intended and had knowledge that their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire." J.A. at 59. Paladin has even stipulated that it "engaged in a marketing strategy intended to attract and assist criminals and would-be criminals who desire information and instructions on how to commit crimes." Id. These stipulations are more than sufficient to foreclose an absolute First Amendment defense to plaintiffs' suit. See DOJ Report at 43 & 44-45 n.71 ("[W]e believe that the district court in Rice v. Paladin erred insofar as it concluded that Brandenburg bars liability for dissemination of[instructions on murder] regardless of the publisher's intent. . . . [Defendant Paladin's] concession[s] would, for purposes of summary judgment, seem to foreclose a constitutional defense . . .").

The district court was never required to consider the intent requirement under Maryland's law of aiding and abetting, much less whether the First Amendment imposes a heightened intent standard in the context of authorizing liability for speech acts, because of its mistaken conclusion that Maryland does not recognize a civil cause of action for aiding and abetting. In analogizing this case to the copycat cases (and seemingly in order to permit the analogy), however, the district court accepted Paladin's post hoc "clarification" that it meant by its stipulation only that it was reasonably foreseeable to the publisher that, once the book was published and publicly available, it would be used by murderers to plan and to commit murder. Thus, in accepting the defendants' belated clarification, the district court said:

> Defendants conceded that they intended that their publications would be used by criminals to plan and execute murder

37

> as instructed in the manual. . . . However, Defendants clarify
> their concession by explaining that when they published,
> advertised and distributed both Hit Man and Silencers, they
> knew, and in that sense "intended," that the books would be
> purchased by all of the categories of readers previously
> described and used by them for the broad range of purposes
> previously described.

J.A. at 215-16 (citations omitted). Of course, the district court was
without authority to allow Paladin to alter the parties' stipulation uni-
laterally, particularly given that Paladin was the party moving for
summary judgment. If anything, the stipulation should have been, and
in any event must now be, interpreted in the light most favorable to
the plaintiffs.

Furthermore, even if the stipulation only established knowledge,
summary judgment was yet inappropriate because a trier of fact could
still conclude that Paladin acted with the requisite intent to support
civil liability. Wholly apart from Paladin's stipulations, there are four
bases upon which, collectively, if perhaps not individually, a reason-
able jury could find that Paladin possessed the intent required under
Maryland law, as well as the intent required under any heightened
First Amendment standard. Compare DOJ Report, at 45 n.71 ("[E]ven
assuming arguendo that the defendants' own construction of the
`intent' stipulation were correct, that still would not justify the grant
of summary judgment, since it would leave unanswered the question
whether Paladin also had the specific purpose of facilitating mur-
der.").

First, the declared purpose of Hit Man itself is to facilitate murder.
Consistent with its declared purpose, the book is subtitled "A Techni-
cal Manual for Independent Contractors," and it unabashedly
describes itself as "an instruction book on murder," Hit Man at ix. A
jury need not, but plainly could, conclude from such prominent and
unequivocal statements of criminal purpose that the publisher who
disseminated the book intended to assist in the achievement of that
purpose.

Second, the book's extensive, decided, and pointed promotion of
murder is highly probative of the publisher's intent, and may be con-

38

sidered as such, whether or not that promotion, standing alone, could serve as the basis for liability consistent with the First Amendment. See Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); cf. Noto, 367 U.S. at 299.**7** After carefully and repeatedly reading Hit Man in its entirety, we are of the view that the book so overtly promotes murder in concrete, nonabstract terms that we regard as disturbingly disingenuous both Paladin's cavalier suggestion that the book is essentially a comic book whose "fantastical" promotion of murder no one could take seriously, and amici's reckless characterization of the book as "almost avuncular," see Br. of Amici at 8-9. The unique text of Hit Man alone, boldly proselytizing and glamorizing the crime of murder and the "profession" of murder as it dispassionately instructs on its commission, is more than sufficient to create a triable issue of fact as to Paladin's intent in publishing and selling the manual.

Third, Paladin's marketing strategy would more than support a finding of the requisite intent. Cf. Direct Sales v. United States, 319 U.S. 703, 712-13 (1943) (holding that jury may infer intent to assist a criminal operation based upon a drug distributor's marketing strategy). It is known through Paladin's stipulations that it "engaged in a marketing strategy intended to attract and assist criminals and would-be criminals who desire information and instructions on how to commit crimes." J.A. at 59. But an inference as to such a strategy would be permitted from Paladin's catalogue advertisement of Hit Man. The

_____

**7** Cf. DOJ Report at 30 & n.47 (citations omitted) ("Insofar as publication of [bombmaking] manuals were criminalized on account of those manuals' advocacy of unlawful conduct, such a prohibition almost certainly could not pass constitutional muster. The First Amendment would not, however, prohibit the evidentiary use of such advocacy to demonstrate a disseminator's intent in conveying bombmaking information. Therefore, insofar as criminal culpability for dissemination of such information depends upon the distributors' intent -- for example, upon whether a disseminator of bombmaking manuals had the conscious purpose of helping others to use the information to engage in unlawful conduct -- the substance of the advocacy in such manuals could be used as material evidence of such intent.").

39

publisher markets the book as follows, invoking a disclaimer which, the district court's characterization notwithstanding, a jury could readily find to be transparent sarcasm designed to intrigue and entice:

> Learn how a pro gets assignments, creates a false identity, makes a disposable silencer, leaves the scene without a trace, watches his mark unobserved and more. Feral reveals how to get in, do the job and get out without getting caught. <u>For academic study only!</u>

Paladin Press Catalog, Vol. 26, No. 2 at 41 (emphasis in original). <u>See also infra</u> note 10. From this statement by the publisher in its own promotional sales catalogue, a jury could conclude that Paladin marketed <u>Hit Man</u> directly and even primarily to murderers and would-be criminals, and, from this permissible conclusion, in turn conclude that Paladin possessed the requisite intent necessary to support liability.

Certainly, such a conclusion would be reasonable based upon this promotional description coupled with the singular character of <u>Hit Man</u>, which is so narrowly focused in its subject matter and presentation as to be effectively targeted exclusively to criminals. In other words, despite the fact that Paladin may technically offer the book for sale to all comers, we are satisfied that a jury could, based upon <u>Hit Man</u>'s seemingly exclusive purpose to assist murderers in the commission of murder, reasonably conclude that Paladin essentially distributed <u>Hit Man</u> only to murderers and would-be murderers -- that its conduct was not, at least in law, different from that of a publisher (or anyone else) who delivered <u>Hit Man</u> to a specific person or group of persons whom the publisher knew to be interested in murder. And even Paladin effectively concedes that it could be liable were such a finding permissibly made. Paladin's Memorandum in Support of Summary Judgment at 33 n.24.

A conclusion that Paladin directed <u>Hit Man</u> to a discrete group rather than to the public at large would be supported, even if not established, by the evidence that <u>Hit Man</u> is not generally available or sold to the public from the bookshelves of local bookstores, but, rather, is obtainable as a practical matter only by catalogue. Paladin Press is a mail order company, and for the most part does not sell books through retail outlets. In order to procure a copy of <u>Hit Man</u>,

40

the prospective reader must first obtain a copy of Paladin's catalogue, typically by completing a request form reprinted in one of Paladin's advertisements in specialized magazines such as Soldier of Fortune. After obtaining that catalogue, the reader must scan the list of book titles and read the accompanying descriptions. Once the reader finds the book he desires, he must then complete and mail another form to order the book.

From the requirements of this process, together with the book's character, a jury need not, but could, permissibly find that Hit Man is not at all distributed to the general public and that, instead, it is available only to a limited, self-selected group of people interested in learning from and being trained by a self-described professional killer in various methods of killing for money, individuals who are then contemplating or highly susceptible to the commission of murder.

Finally, a jury could reasonably conclude that Paladin specifically intended to assist Perry and similar murderers by finding, contrary to Paladin's demurs, as would we, that Hit Man's only genuine use is the unlawful one of facilitating such murders.**8** Cf. J.A. at 221 (observation by district court that Hit Man is "devoid of any significant redeeming social value"). Although before us Paladin attempts to hypothesize lawful purposes for Hit Man, and it would doubtless advance the same hypotheses before a jury, at some point hypotheses are so implausible as to be deserving of little or no weight. The likelihood that Hit Man actually is, or would be, used in the legitimate manners hypothesized by Paladin is sufficiently remote that a jury could quite reasonably reject them altogether as alternative uses for the book. If there is a publication that could be found to have no other use than to facilitate unlawful conduct, then this would be it, so devoid is the book of any political, social, entertainment, or other legitimate discourse. Cf. Miller v. California, 413 U.S. 15 (1973) (distinguishing obscene from nonobscene material in part on basis of "whether the work, taken as a whole, lacks serious literary, artistic,

_____

**8** Paladin contends that plaintiffs have stipulated "that the defendant's book has substantial informational value unrelated to the facilitation of crime." Appellee's Br. at 29 (footnote omitted). But they have not; they have stipulated only that Paladin's "marketing strategy" was intended to reach audiences beyond criminals and would-be criminals. J.A. at 60.

political, or scientific value"). Thus, for example, a jury would certainly not be unreasonable in dismissing (in fact, it arguably would be unreasonable in accepting) Paladin's contention that <u>Hit Man</u> has significant social value in that the book, in the course of instructing murderers how to murder, incidentally informs law enforcement on the techniques that the book's readers will likely employ in the commission of their murders. Likewise, a reasonable jury could simply refuse to accept Paladin's contention that this purely factual, instructional manual on murder has entertainment value to law-abiding citizens. And, just as a permissible inference as to Paladin's marketing strategy would be supportable by evidence as to the specialized process by which one acquires <u>Hit Man</u>, either of these conclusions as to the absence of lawful purpose could be reinforced by the same evidence.

In summary, a reasonable jury clearly could conclude from the stipulations of the parties, and, apart from the stipulations, from the text of <u>Hit Man</u> itself and the other facts of record, that Paladin aided and abetted in Perry's triple murder by providing detailed instructions on the techniques of murder and murder for hire with the specific intent of aiding and abetting the commission of these violent crimes.

B.

Any argument that <u>Hit Man</u> is abstract advocacy entitling the book, and therefore Paladin, to heightened First Amendment protection under <u>Brandenburg</u> is, on its face, untenable. Although the district court erred in its alternative conclusion that the speech of <u>Hit Man</u> is protected advocacy, <u>see</u> discussion <u>infra</u> at III.B.2, even that court expressly found that "the book merely teaches what must be done to implement a professional hit." J.A. at 217-18; <u>id</u>. at 218 n.4 (discussing "instructive nature" of book). Indeed, Paladin's protests notwithstanding, this book constitutes the archetypal example of speech which, because it methodically and comprehensively prepares and steels its audience to specific criminal conduct through exhaustively detailed instructions on the planning, commission, and concealment of criminal conduct, finds no preserve in the First Amendment. To the extent that confirmation of this is even needed, given the book's content and declared purpose to be "an instruction book on murder," <u>Hit Man</u> at ix, that confirmation is found in the stark contrast between this

42

assassination manual and the speech heretofore held to be deserving of constitutional protection.

1.

Through its stipulation that it intended <u>Hit Man</u> to be used by criminals and would-be criminals to commit murder for hire <u>in accordance with the book's instructions</u>, Paladin all but concedes that, through those instructions, <u>Hit Man</u> prepares and steels its readers to commit the crime of murder for hire. But even absent the publisher's stipulations, it is evident from even a casual examination of the book that the prose of <u>Hit Man</u> is at the other end of the continuum from the ideation at the core of the advocacy protected by the First Amendment.

The cover of <u>Hit Man</u> states that readers of the book will "[l]earn how a pro makes a living at this craft [of murder] without landing behind bars" and,

> how he gets hit assignments, creates a false working identity, makes a disposable silencer, leaves the scene without a trace of evidence, watches his mark unobserved, and more . . . how to get in, do the job, and get out -- without getting caught.

In the first pages of its text, <u>Hit Man</u> promises, consistent with its title as "A Technical Manual for Independent Contractors," that the book will prepare the reader, step by step, to commit murder for hire:

> Within the pages of this book you will learn one of the most successful methods of operation used by an independent contractor. You will follow the procedures of a man who works alone, without backing of organized crime or on a personal vendetta. Step by step you will be taken from research to equipment selection to job preparation to successful job completion. You will learn where to find employment, how much to charge, and what you can, and <u>cannot</u>, do with the money you earn.

43

> But deny your urge to skip about, looking for the "good" parts. Start where any amateur who is serious about turning professional will start--at the beginning.

Hit Man at x-xi (emphasis in original). And, faithful to these promises, in the successive chapters of the 130 pages that follow, Hit Man systematically and in meticulous detail instructs on the gruesome particulars of every possible aspect of murder and murder for hire. The manual instructs step-by-step on building and using fertilizer bombs, constructing silencers, picking locks, selecting and using poisons, sinking corpses, and torturing victims. It teaches would-be assassins how to arrive at, and conduct surveillance of, a potential victim's house, and it instructs on the use of a fake driver's license and registration at a motel, the placement of stolen out-of-state license plates on rental cars, and the deception of the postal service into delivering weapons to the murder scene. The book instructs the reader in murder methods, explaining in dispassionate and excruciatingly graphic detail how to shoot, stab, poison, and incinerate people, and in gory detail it expounds on which methods of murder will best ensure the death of the victims. The book schools the reader on how to escape the crime scene without detection, and how to foil police investigations by disassembling and discarding the murder weapon, altering the ballistics markings of that weapon, stealing and switching license plates, and disguising the reader's physical appearance. And it counsels on how to manipulate the legal system, if caught.

At the risk of belaboring the obvious, but in order to appreciate the encyclopedic character of Hit Man's instructions, one need only consider the following chapter-by-chapter synopsis.

Chapter One of Hit Man, entitled "The Beginning -- Mental and Physical Preparation," starts by outlining the "essential" steps to becoming a professional killer. Hit Man at 9. The book urges the reader to read other books from publishers such as Paladin Press, but it cautions that "[b]ooks on subjects related to the professional hit man are hard to find [and that] there are [only] a few publishers out there who have the backbone to provide those . . . who take life seriously with the necessary educational materials." Hit Man at 9-10. The book goes on to recommend that one read articles in magazines such as Soldier of Fortune, and military newsletters in order to "[s]tay

44

abreast of new trends and developments [in weapons and techniques of killing] as well as new gadgets and inventions as they become available." Hit Man at 9. It also encourages the reader to comb fictional accounts of murder, on the off chance that, for example, "the warped imagination of a fiction writer will point out an obvious but somehow never before realized method of pacification or body disposal." Id. at 10. It instructs its readers to study their local newspapers carefully "to see who in your area might be your next employer . . . or victim," and to use the classified advertisements, among other things, to find "new toys and pick them up from private owners to avoid registering your weapons." Id. The book provides in-depth advice on using a variety of publicly available reference materials to locate weapons and other "equipment," gather information about victims, and plan murders for hire. For example, the book instructs its readers to go to the auto tag department of the county courthouse and "[l]ook up the mark by last name or tag number for address," because books containing such information are often "left out for public use." Id. at 12. Similarly, the book instructs the readers in how to use the postal service to "track[ ] down the last known address of anyone you choose as a function of the Freedom of Information Act," id. at 14, and to send weapons safely to the location of a planned murder, id. at 13.

In addition, Hit Man instructs its readers to become familiar with local law enforcement techniques, for example by obtaining law enforcement handbooks, and it provides practical advice on how to obtain these books, either from "any college bookstore where law enforcement courses are taught," id. at 14, or by theft. The book also offers the readers practical tips on diet, fitness, combat training, ("Veterans with wartime experience and the ability to kill are first choice instructors." Id. at 17), and observational skills. Although much of the information in this chapter is not explicit in outlining the methods of terror, it is explicit in advising the would-be assassin where to turn for additional information beyond that found between the covers of the book.

Chapter Two of the book, entitled "Equipment-- Selection and Purpose," imparts a wealth of information on the"basic equipment" the "beginner" will need as tools of his trade, id. at 21, and provides detailed instructions as to the equipment's use. For example, the book

45

first instructs the reader to obtain, <u>inter alia</u>, an AR-7 rifle, hollow-point bullets, disposable silencers, liquid poison, disposable rubber gloves, a double-edged knife with a six-inch blade, handcuffs, and a ski mask. <u>See id</u>. at 21-22. The book next provides precise instructions on how to kill, using each of the various weapons. The manual recommends "close kills," and teaches that:

> When using a small caliber weapon like the 22, it is best to shoot from a distance of three to six feet. You will not want to be at point-blank range to avoid having the victim's blood splatter you or your clothing. At least three shots should be fired to ensure quick and sure death.
>
> You can judge when death has occurred by observing the wound. When the blood ceases to flow, the heart has stopped working. Check for pulse at both the wrist and throat as an added precaution.

<u>Id</u>. at 24. The book goes on to teach which weapons to avoid and why, explaining, for example, that,

> [a]lthough revolvers are often depicted as being a favorite tool among hit men, they are <u>not</u> recommended by this pro. Revolvers cannot be effectively silenced. The open cylinder allows gases to escape, thus making noise. When fired, gas is forced around the cylinder in a 360 degree circle, thereby throwing powder all over the person who fires the gun.
>
> An automatic, on the other hand, is tightly sealed so that when it is fired almost all the powder residue is forced into the silencer, where it is trapped. This prevents the powder from escaping and covering the person who fired the shot. . . . If a shell catcher is used, the powder residue will become trapped inside the catch bag.

<u>Id</u>. at 26. The manual further instructs how to kill efficiently at close-range with a knife:

> The knife you carry should have a six-inch blade with a serrated section for making efficient, quiet kills. . . .

46

The knife should have a double-edged blade. This double edge, combined with the serrated section and six-inch length, will insure a deep, ragged tear, and the wound will be difficult, if not impossible, to close without prompt medical attention.

Make your thrusts to a vital organ and twist the knife before you withdraw it. If you hit bone, you will have to file the blade to remove the marks left on the metal when it struck the victim's bone.

Id. at 27-28. The book also instructs on alternatives to the close-range kill, including instructions such as the following:

If you must do your shooting from a distance, use a rifle with a good scope and silencer and aim for the head-- preferably the eye sockets if you are a sharpshooter. Many people have been shot repeatedly, even in the head, and survived to tell about it.

Id. at 24. Finally, the chapter includes a host of other instructions on how to use basic tools, ranging from handcuffs, to lock picks, to surveillance equipment, in the commission of murder. For instance, the book teaches the need for a hit man to always wear gloves and it discusses glove choice, recommending surgical gloves because,

[l]eather gloves are not to be considered as a job tool. The leather has the same individual, distinct characteristics as the human fingerprint. If you have to use leather gloves, destroy them immediately after the job. If found in your possession, they can convict you as quickly as a set of your own fingerprints.

Id. at 27. The chapter continues in like vein.

Chapter Three, entitled "The Disposable Silencer-- A Poor Man's Access to a Rich Man's Toy," teaches the reader, with step-by-step instructions and accompanying photographic illustration, how to construct a "whisper-quiet," "inexpensive," and "effective" disposable

47

silencer that is "reusable for over four hundred rounds." Id. at 47, 51. These directions are designed to allow the "amateur" to construct disposable silencers, which, the book explains, are "one of the most important tools a professional will ever have." Id. at 38. As the book explains, these "same directions can be followed successfully to construct a silencer for any weapon, with only the size of the drill rod used for alignment changed. . . ." Id. at 39.

Hit Man's Chapter Four, entitled "More Than One Way To Kill a Rabbit -- The Direct Hit is Not Your Only Alternative," includes discursive instructions on numerous additional methods of killing and torture. If "several marks will be together in one place at the same time," the book teaches, one can kill all of the "marks" with a fertilizer bomb, and it goes on to teach the reader, through step-by-step instructions, how to build such a bomb. Id. at 54-55. The chapter teaches the reader how to kill by arson, admonishing and instructing, "Don't ever use gasoline or other traceable materials to start your fire. [Specified substance] is your best starter because it burns away all traces." Id. at 56. In addition, the chapter includes instructions such as that, "[a] fire victim will have smoke present in his lungs. Therefore, if this is your choice of extermination, your mark should be unconscious, but breathing, when the fire is set. Make sure no scratches or bruises point to foul play." Id. Later in the chapter, Hit Man discusses poisons. After teaching an elaborate method for obtaining hard-to-find poisons through impersonation, the manual explains how one can successfully use substances such as tetrodotoxin, oleander, nicotine, and jessamine to kill his victims. See id. at 58-63. The chapter's discussion of torture techniques provides explicit advice on how to inflict sufficient pain to ensure that "people will tell you anything you want to know, even when they are sure they are about to die." Id. at 64. In what is offered as a helpful example, the book illustrates from the author's own experience:

> We [the book's author and his accomplice, referred to only as "the Indian"] subdued the [victim], stripped him to the waist and tied him into a wooden chair.
>
> . . .
>
> The Indian pulled an ice pick from his hip pocket.

48

. . .

   . . . Suddenly he stopped and inserted the tip of the pick into the [victim's] upper arm about a quarter of an inch. When he withdrew the pick, there was a sickening little popping sound as blood spurted from the wound for a second, then stopped.

   . . .

   Several stabs later, the [victim] was quivering like a jellyfish, his body like a pin cushion, while the Indian was getting more and more excited and more and more into his work.

   . . . With a malicious grin, [the Indian] pulled a pair of pliers from his other hip pocket and gave me a sly wink. Pointedly, methodically, he began with the [victim's] little finger on his left hand and crunched each knuckle slowly with the pliers. It seemed to take no effort at all on his part as the soft bone gave way under the force of the simple tool. He had only gotten to the third finger when the [victim] began to cry like a baby and spill his guts.

Id. at 65-66. The chapter concludes with instructions for disposing of human corpses without detection, providing directions for, inter alia, hiding the bodies in a river:

   If you choose to sink the corpse, you must first make several deep stabs into the body's lungs (from just under the rib cage) and belly. This is necessary because gases released during decomposition will bloat these organs, causing the body to rise to the surface of the water.

   The corpse should be weighted with the standard concrete blocks, but it must be wrapped from head to toe with heavy chain as well, to keep the body from separating and floating in chunks to the surface. After the fishes and natural elements have done their work, the chain will drag the bones into the muddy sediment.

49

Id. at 67. And the instructions we repeat here are but a few of the methods of inflicting torture and death taught in the chapter.

The next chapter, entitled "Homework and Surveillance -- Mapping a Plan and Checking It for Accuracy," instructs on how to obtain information about the victim from the client. It explains the importance of finding out information such as whether the victim has a dog or other pet that might provide a warning of the impending assassination, the layout of the victim's residence, and whether the victim has roommates or neighbors. The chapter includes a lengthy "sample information sheet" that may be used in planning a first kill. Id. at 73-80.

Chapter Six, entitled "Opportunity Knocks -- Finding Employment, What to Charge, What to Avoid," teaches readers how to find someone who will hire their services as professional killers. The chapter explains where to find potential employers, what to look for in such persons, and what to charge for each murder:

> Prices vary according to the risk involved, social or political prominence of the victim, difficulty of the assignment, and other factors. A federal judge [Judge Wood, slain in Texas in 1978] recently brought a price of $250,000, for example. A county sheriff might bring $75,000 to $100,000.
>
> . . .
>
> . . . It is not recommended that you take any contract that pays less than $30,000, and that is working mighty cheap. To work for any amount less would be amateurish. . ..
>
> There are two good reasons for setting a $30,000 minimum for your services. First, the risks involved are high. . . . A fee of $5,000 or even $10,000 will be of little consolation as you wait helplessly behind bars.
>
> Second, because the risks are so high and employment opportunities are limited, the money you earn should be sufficient to carry you over until your next job comes along.

50

Id. at 90-91. The chapter also provides instructions on how to communicate with the employer after the hit, explaining, for example, that it is best to develop a code for informing the employer that the contract has been fulfilled, such as calling the employer's residence and asking to speak with a fictitious individual, whose name signals to the employer that the victim is dead. See id. at 93-94.

In the following chapter, titled "Getting the Job Done Right -- Why the Described Hit Went Down the Way It Did," Hit Man provides instructions for reaching the victim's location, transporting tools, preparing to commit the murder, and cleaning up the crime scene and escaping after the killing. Illustrative of the chapter's directions for preparing to commit the murder:

> Wipe down your weapons as you assemble them. Even the inner parts of your guns must be wiped to remove any prints that were left behind during the last cleaning.
>
> Wipe down each bullet and wear rubber gloves as you load the clip. Just in case you leave behind an empty cartridge, you don't want your fingerprint emblazoned on the casing.

Id. at 103. Similarly, the manual instructs on how best to discard the clothes worn to commit the killing:

> The first thing you should do when you reach the car [after killing your victims] is change into another disguise and get out of those work clothes. Check them for bloodstains. If there are none, you can toss them into a charity collection box or trash can. If the victim's blood is on those clothes, they must be burned or buried.

Id. at 105. And it explains, with respect to sanitization of the rental car:

> [S]top and wipe the car for prints and wear driving gloves as you return the car to the rental agency. . . .[W]ash the car and vacuum the interior immediately when you arrive at

51

> your destination [because] foreign soil from the [crime
> scene] is now imbedded in the car's interior[and its] air fil-
> ter . . . .

Id. at 106.

Chapter 8, entitled "Danger: Ego, Women, and Partners -- Con-
trolling Your Situation" instructs the reader on how, as a professional
killer, to use money, women, and partners. This chapter of the book,
for example, instructs the reader on how to use women while commit-
ting professional killings without getting caught. Thus, after explain-
ing that the "deceitful, `game-playing' natures" of women make them
potentially better professional killers than men, the book goes on to
say that,

> [f]ortunately for the world, a woman usually makes only
> one man her target, and the nesting instinct quickly takes her
> off the street and ties her down to the little world of babies,
> laundry and housework she creates and protects for her own.
> Unfortunately, even a hit man cannot deny that what women
> have to offer is a basic necessity.
>
>  . . .
>
> [Cautioning against marriage], if [your wife] knows too
> much, she could someday become [your] worst enemy on
> the face of the earth and may someday have to be eliminated
> in the name of self-preservation.
>
>  And if she knows too little, her suspicious, jealous nature
> could lead to more snooping and following and conjecture
> on her part than is healthy -- for either of [you].
>
>  . . .
>
>  . . . Women are highly emotional, rarely rational crea-
> tures. Is ten minutes of pleasure worth your life at the hands
> (or tongue) of an irate spouse?
>
>  . . .

52

> Ideally, a professional hit man will remain single. He will either purchase his sexual pleasures or participate in impersonal one-night-stands. His involvement with women will only be on a sexual level. He will not live with them, nor will he let them invade his privacy . . . . In most cases, they won't even know his real name.
>
> . . .
>
> As a man, I appreciate as much as anyone a good-looking body and a warm, willing smile on a woman. As a professional, however, that seems to have lost some of its thrill as I've moved on to bigger, more exciting and more dangerous prey.

Id. at 114-17. The chapter also advises the reader on how to enjoy the fruits of crime without getting caught, warning that,

> Unless you have additional sources of income to justify large expenditures like a new home, paying off an old mortgage or a new sports car, don't spend any of your earnings on big items of this type. Big expenditures arouse suspicion, not only of your friends and family, but of the IRS and the authorities if you should ever come under investigation.

Id. at 113.

The final chapter of Hit Man, entitled "Legally Illegal," includes various sections instructing the reader on how and where to purchase false identification, how to make false identification, how to launder illegal money, and how to act in encounters with law enforcement officers. For example, the book instructs on how to "launder" "illegal money" through the use of a tax haven in the Cayman Islands:

> The procedure is really quite simple: You form a corporation in [an offshore Island country] and put your illegal monies into that corporation. Then you form a legal U.S. corporation as your business and borrow the money you need to get going from the foreign corporation you have previously set up. . . .

53

Let's say your legal American corporation is a land development company, because you want to invest your laundered monies into real estate. . . .

[Instructions continue].

Id. at 124. The book concludes by offering advice on how to escape punishment by exploiting legal technicalities in the event that the reader is arrested by the police, including how to avoid jailhouse snitches and undercover agents.

As Hit Man instructs, it also steels its readers to the particular violence it explicates, instilling in them the resolve necessary to carry out the crimes it details, explains, and glorifies. Language such as that which is reprinted in the prologue to this opinion, and similar language uncanny in its directness and power, pervades the entire work:

You may threaten, bargain, torture or mutilate to get the information you want, and you must be prepared to use whatever method works.

. . .

You are working. This is your job and you are a professional.

. . .

. . . You have the power and ability to stand alone. You no longer need a reason to kill.

. . .

. . . You are a hardened criminal. You are capable of performing cold-blooded murder for a fee . . . . [Y]ou are not fit to be a part of organized society.

Id. at 66, 100, 111, 127 (second emphasis added). Speaking directly to the reader in the second person, like a parent to a child, Hit Man

54

addresses itself to every potential obstacle to murder, removing each, seriatim, until nothing appears to the reader to stand between him and his execution of the ultimate criminal act. To those who are reluctant because of the value of human life, Hit Man admonishes that "[l]ife is not robust and precious and valuable" and that "[e]verything you have been taught about life and its value was a fallacy[,] [a] dirty rotten lie." Id. at 107. To those who fear guilt or remorse, the book reassures:

> You made it! Your first job was a piece of cake! Taking all that money for the job was almost like robbery. Yet here you are, finally a real hit man with real hard cash in your pockets and that first notch on your pistol.
>
> . . .
>
> [After killing your first victim] [Y]ou felt absolutely nothing. And you are shocked by that nothingness. You had expected this moment to be a spectacular point in your life. You had wondered if you would feel compassion for the victim, immediate guilt, or even experience direct intervention by the hand of God. But you weren't even feeling sickened by the sight of the body.

Id. at 106-07. And the book allays the natural apprehension about the immediate aftermath of the murders it counsels:

> After you have arrived home [after your kill], the events that took place take on a dreamlike quality. You don't dwell on them. You don't worry. You don't have nightmares. You don't fear ghosts. When thoughts of the hit go through your mind, it's almost as though you are recalling some show you saw on television.
>
> By the time you collect the balance of your contract fee, the doubts and fears of discovery have faded. Those feelings have been replaced by cockiness, a feeling of superiority, a new independence and self-assurance.

55

Id. at 108. Those who fear their cold-bloodedness are assuaged with the reminders that "a hit man has a wide range of feelings" and that he "may be extremely compassionate towards the elderly or disabled" or "even . . . religious in his own way." Id. at 106. And for those who fear only that they will be caught, comes the ominous pledge that "the American Justice System is so bogged down in technicalities, over-crowded jails, plea bargaining and a host of other problems that even if charged with a serious crime, we [as killers] can rest assured that the law is on our side," see id. at 125, that a "true" "professional" "won't ever have to face [various] legal predicaments." Id. at 130.

Indeed, one finds in Hit Man little, if anything, even remotely characterizable as the abstract criticism that Brandenburg jealously protects. Hit Man's detailed, concrete instructions and adjurations to murder stand in stark contrast to the vague, rhetorical threats of politically or socially motivated violence that have historically been considered part and parcel of the impassioned criticism of laws, policies, and government indispensable in a free society and rightly protected under Brandenburg. The speech of Hit Man defies even comparison with the Klansman's chilling, but protected, statement in Brandenburg itself that, "[the Ku Klux Klan is] not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken," 395 U.S. at 446; the protestor's inciteful, but protected, chant in United States v. Hess, 414 U.S. 105, 108 (1973) that "[w]e'll take the fucking street again"; the NAACP speaker's threat, rhetorical in its context, to boycott violators that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck," which was held to be protected in NAACP v. Claiborne Hardware Co., 458 U.S. 886, 902 (1982); or the draft protestor's crude, but protected, blustering in Watts that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J," Watts v. United States, 394 U.S. 705, 706 (1969).

Plaintiffs observed in their submissions before the district court that,

> Hit Man is not political manifesto, not revolutionary diatribe, not propaganda, advocacy, or protest, not an outpouring of conscience or credo.

56

. . .

> It contains no discussion of <u>ideas</u>, no argument, no information about politics, religion, science, art, or culture . . . it offers no agenda for self-governance, no insight into the issues of the day . . . .

Appellant's Br. at 32; Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment at 31-32. And, this is apt observation. <u>Hit Man</u> is none of this. Ideas simply are neither the focus nor the burden of the book. To the extent that there are any passages within <u>Hit Man</u>'s pages that arguably are in the nature of ideas or abstract advocacy, those sentences are so very few in number and isolated as to be legally of no significance whatsoever.**9** <u>Cf</u>. <u>Kois</u> v. <u>Wisconsin</u>, 408 U.S. 229, 231 (1972) ("A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication."); <u>see also</u> <u>Miller</u>, 413 U.S. at 24; <u>Penthouse International, Ltd.</u> v. <u>McAuliffe</u>, 610 F.2d 1353 (5th Cir. 1980), <u>cert</u>. <u>dismissed</u>, 447 U.S. 931 (1980). <u>Hit Man</u> is, pure and simple, a step-by-step murder manual, a training book for assassins. There is nothing even arguably tentative or recondite in the book's promotion of, and instruction in, murder.**10** To the

_____

**9** This circuit and others have repeatedly rejected Paladin's argument that speech can be punished under the speech act doctrine, without regard to the strictures of <u>Brandenburg</u>, only when that speech has <u>no</u> purpose or value other than to facilitate a specific wrongful act. <u>See</u> Appellee's Supp. Br. at 9. Thus, in <u>Kelley</u>, we found the defendant's concrete promotion of, and provision of instructions for, tax evasion unprotected by the First Amendment, even though the defendant offered his advice in a meeting of a group indisputably dedicated to the political belief that the federal income tax is unconstitutional as applied to wages. 769 F.2d at 216-17. And in <u>Freeman</u>, the Ninth Circuit upheld a similar conviction, even though the defendant's speech "spr[ang] from the anterior motive to effect political or social change." 761 F.2d at 551. <u>See also Agee</u>, 453 U.S. at 308-09 (holding that a former Central Intelligence Agency employee's disclosure of intelligence information was unprotected by the First Amendment even though the employee was "also engaged in criticism of the Government").

**10** The several brief "disclaimers" and "warnings" in <u>Hit Man</u>'s advertisement description and on its cover, that the book's instructions are "for

57

contrary, the book directly and unmistakably urges concrete violations of the laws against murder and murder for hire and coldly instructs on the commission of these crimes. The Supreme Court has never protected as abstract advocacy speech so explicit in its palpable entreaties to violent crime.

2.

In concluding that Hit Man is protected "advocacy," the district court appears to have misperceived the nature of the speech that the Supreme Court held in Brandenburg is protected under the First Amendment. In particular, the district court seems to have misunderstood the Court in Brandenburg as having distinguished between "advocating or teaching" lawlessness on the one hand, and "inciting or encouraging" lawlessness on the other, any and all of the former being entitled to First Amendment protection. The district court thus framed the issue before it as "whether Hit Man merely advocates or teaches murder or whether it incites or encourages murder." J.A. at 212. And, finding that Hit Man "merely teaches" in technical fashion the fundamentals of murder, it concluded that "[t]he book does not cross that line between permissible advocacy and impermissible incitation to crime or violence." Id. at 218.

The Court in Brandenburg, however, did not hold that "mere teaching" is protected; the Court never even used this phrase. And it certainly did not hold, as the district court apparently believed, that all teaching is protected. Rather, however inartfully it may have done so, the Court fairly clearly held only that the "mere abstract teaching" of principles, id. at 447-48 (quoting Noto , 367 U.S. at 297-98) (emphasis

_____

informational purposes only!" and "for academic study only!," and that "[n]either the author nor the publisher assumes responsibility for the use or misuse of the information contained in this book," are plainly insufficient in themselves to alter the objective understanding of the hundreds of thousands of words that follow, which, in purely factual and technical terms, tutor the book's readers in the methods and techniques of killing. These "disclaimers" and "warnings" obviously were affixed in order to titillate, rather than "to dissuade readers from engaging in the activity [the book] describes," as the district court suggested they might be understood, J.A. at 219.

58

added), and "mere advocacy," 395 U.S. at 448-49 (emphasis added), are protected. In the final analysis, it appears the district court simply failed to fully appreciate the import of the qualification to the kind of "teaching" that the Supreme Court held to be protected in Brandenburg. See J.A. at 217 (defining "advocacy" as "mere teaching" rather than "mere abstract teaching" but citing to Brandenburg, 395 U.S. at 448 (quoting Noto, 367 U.S. at 297-98)). As the Supreme Court's approving quotation from its opinion in Noto confirms, it is not teaching simpliciter, but only "the mere abstract teaching . . . of the moral propriety or even moral necessity" for resort to lawlessness, or its equivalent, that is protected under the commands of Brandenburg. 367 U.S. at 297-98 (emphasis added).**11**

Although we believe the district court's specific misreading of Brandenburg was plainly in error, we cannot fault the district court for its confusion over the opinion in that case. The short per curiam opinion in Brandenburg is, by any measure, elliptical.

In particular, the Court unmistakably draws the distinction discussed above, between "the mere abstract teaching. . . of the moral propriety or even moral necessity for a resort to force and violence" on one hand, 395 U.S. at 448, and the "prepar[ation] [of] a group for violent action and steeling it to such action" on the other. Id. And it then recites in the very next sentence that "[a] statute which fails to draw this distinction," id. (emphasis added) -- a seeming reference to the distinction between "mere abstract teaching" and "preparing and steeling" -- is unconstitutional under the First Amendment. In the succeeding paragraph and a later footnote, however, the Court distinguishes between "mere advocacy" and "incitement to imminent law-

_____

**11** Even if the district court were correct in its holding that Hit Man is speech somehow deserving of the protections of Brandenburg, we would yet be constrained to reverse the court's judgment. Given Paladin's remarkable stipulations that it knew that its murder manual would be used by murderers, would-be murderers, and other criminals "upon receipt" to assist them in the planning, commission, and cover up of their crimes, that the publisher intended that the manual would be so used, and that Hit Man actually assisted Perry's commission of the crime of murder, we could not conclude as a matter of law that Hit Man is not directed to inciting and likely to incite imminent lawlessness.

59

less action," a distinction which, as a matter of common sense and common parlance, appears different from the first distinction drawn, because "preparation and steeling" can occur without "incitement," and vice-versa. See id. at 448 ("Neither the indictment nor the trial judge's instructions to the jury in any way refined the statute's bald definition of the crime in terms of mere advocacy not distinguished from incitement to imminent lawless action." (footnote omitted)); id. at 449 n.4 ("Statutes affecting the right of assembly, like those touching on freedom of speech, must observe the established distinctions between mere advocacy and incitement to imminent lawless action . . . ." ).

It would have been natural, based upon its prior cases, for the Court actually to have contemplated and intended both distinctions, and to have developed the latter only, because the case before it turned exclusively on that distinction. It is more likely, however, that the Court did not focus at all on the seeming facial incongruity between the first and the latter two of these distinctions. The Court, therefore, may well have intended to equate the preparation and steeling of a group to violent action with speech that is directed to inciting imminent lawless action and likely to produce such action. In other words, the Court may well have meant to imply that one prepares and steels another or others for violent action only when he does so through speech that is "directed to inciting or producing imminent lawless action and . . . [that is] likely to incite or produce such action," id. at 447, and thus that preparation and steeling is not per se unprotected. Compare id. at 447-48 ("As we said in Noto. . . .") with Noto, 367 U.S. at 298 (describing preparation and steeling through "a call to violence"). Assuming that it did so mean to imply, however, we are confident it meant to do so only in the context of advocacy -- speech that is part and parcel of political and social discourse-- which was the only type of speech at issue in Brandenburg, Noto, and the other cases relied upon by the Court. See, e.g., 44 Liquormart v. Rhode Island, 116 S. Ct. 1495, 1505 (1996) (Stevens, J., for plurality) (describing Brandenburg as setting forth "test for suppressing political speech"). The Court even so defined its own holding: "These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action

60

and is likely to incite or produce such action." 395 U.S. at 447 (footnote omitted; emphases added). For, as this case reveals, and as the Court itself has always seemed to recognize, one obviously can prepare, and even steel, another to violent action not only through the dissident "call to violence," but also through speech, such as instruction in the methods of terror or other crime, that does not even remotely resemble advocacy, in either form or purpose. And, of course, to understand the Court as addressing itself to speech other than advocacy would be to ascribe to it an intent to revolutionize the criminal law, in a several paragraph per curiam opinion, by subjecting prosecutions to the demands of Brandenburg's "imminence" and "likelihood" requirements whenever the predicate conduct takes, in whole or in part, the form of speech -- an intent that no lower court has discerned and that, this late in the day, we would hesitate to impute to the Supreme Court.

Accordingly, we hold that plaintiffs have stated, sufficient to withstand summary judgment, a civil cause of action against Paladin Enterprises for aiding and abetting the murders of Mildred and Trevor Horn and Janice Saunders on the night of March 3, 1993, and that this cause of action is not barred by the First Amendment to the United States Constitution.

IV.

Paladin, joined by a spate of media amici, including many of the major networks, newspapers, and publishers, contends that any decision recognizing even a potential cause of action against Paladin will have far-reaching chilling effects on the rights of free speech and press. See Br. of Amici at 3, 22 ("Allowing this lawsuit to survive will disturb decades of First Amendment jurisprudence and jeopardize free speech from the periphery to the core. . . . No expression -- music, video, books, even newspaper articles -- would be safe from civil liability."). That the national media organizations would feel obliged to vigorously defend Paladin's assertion of a constitutional right to intentionally and knowingly assist murderers with technical information which Paladin admits it intended and knew would be used immediately in the commission of murder and other crimes against society is, to say the least, breathtaking. But be that as it may, it should be apparent from the foregoing that the indisputably important First

61

Amendment values that Paladin and amici argue would be imperiled by a decision recognizing potential liability under the peculiar facts of this case will not even arguably be adversely affected by allowing plaintiffs' action against Paladin to proceed. In fact, neither the extensive briefing by the parties and the numerous amici in this case, nor the exhaustive research which the court itself has undertaken, has revealed even a single case that we regard as factually analogous to this case.

Paladin and amici insist that recognizing the existence of a cause of action against Paladin predicated on aiding and abetting will subject broadcasters and publishers to liability whenever someone imitates or "copies" conduct that is either described or depicted in their broadcasts, publications, or movies. This is simply not true. In the "copycat" context, it will presumably never be the case that the broadcaster or publisher actually intends, through its description or depiction, to assist another or others in the commission of violent crime; rather, the information for the dissemination of which liability is sought to be imposed will actually have been misused vis-a-vis the use intended, not, as here, used precisely as intended. It would be difficult to overstate the significance of this difference insofar as the potential liability to which the media might be exposed by our decision herein is concerned.

And, perhaps most importantly, there will almost never be evidence proffered from which a jury even could reasonably conclude that the producer or publisher possessed the actual intent to assist criminal activity. In only the rarest case, as here where the publisher has stipulated in almost taunting defiance that it intended to assist murderers and other criminals, will there be evidence extraneous to the speech itself which would support a finding of the requisite intent; surely few will, as Paladin has, "stand up and proclaim to the world that because they are publishers they have a unique constitutional right to aid and abet murder." Appellant's Reply Br. at 20. Moreover, in contrast to the case before us, in virtually every "copycat" case, there will be lacking in the speech itself any basis for a permissible inference that the "speaker" intended to assist and facilitate the criminal conduct described or depicted. Of course, with few, if any, exceptions, the speech which gives rise to the copycat crime will not directly and affirmatively promote the criminal conduct, even if, in

62

some circumstances, it incidentally glamorizes and thereby indirectly promotes such conduct.

Additionally, not only will a political, informational, educational, entertainment, or other wholly legitimate purpose for the description or depiction be demonstrably apparent; but the description or depiction of the criminality will be of such a character that an inference of impermissible intent on the part of the producer or publisher would be unwarranted as a matter of law. So, for example, for almost any broadcast, book, movie, or song that one can imagine, an inference of unlawful motive from the description or depiction of particular criminal conduct therein would almost never be reasonable, for not only will there be (and demonstrably so) a legitimate and lawful purpose for these communications, but the contexts in which the descriptions or depictions appear will themselves negate a purpose on the part of the producer or publisher to assist others in their undertaking of the described or depicted conduct. Compare Miller, 413 U.S. 15.

Paladin contends that exposing it to liability under the circumstances presented here will necessarily expose broadcasters and publishers of the news, in particular, to liability when persons mimic activity either reported on or captured on film footage and disseminated in the form of broadcast news. Appellee's Br. at 26 n.17. This contention, as well, is categorically wrong. News reporting, we can assume, no matter how explicit it is in its description or depiction of criminal activity, could never serve as a basis for aiding and abetting liability consistent with the First Amendment. It will be self-evident in the context of news reporting, if nowhere else, that neither the intent of the reporter nor the purpose of the report is to facilitate repetition of the crime or other conduct reported upon, but, rather, merely to report on the particular event, and thereby to inform the public.

A decision that Paladin may be liable under the circumstances of this case is not even tantamount to a holding that all publishers of instructional manuals may be liable for the misconduct that ensues when one follows the instructions which appear in those manuals. Admittedly, a holding that Paladin is not entitled to an absolute defense to the plaintiffs' claims here may not bode well for those publishers, if any, of factually detailed instructional books, similar to Hit Man, which are devoted exclusively to teaching the techniques of vio-

63

lent activities that are criminal per se. But, in holding that a defense to liability may not inure to publishers for their dissemination of such manuals of criminal conduct, we do not address ourselves to the potential liability of a publisher for the criminal use of published instructions on activity that is either entirely lawful, or lawful or not depending upon the circumstances of its occurrence. Assuming, as we do, that liability could not be imposed in these circumstances on a finding of mere foreseeability or knowledge that the instructions might be misused for a criminal purpose, the chances that claims arising from the publication of instructional manuals like these can withstand motions for summary judgment directed to the issue of intent seem to us remote indeed, at least absent some substantial confirmation of specific intent like that that exists in this case.

Thus, while the "horribles" paraded before us by Paladin and amici have quite properly prompted us to examine and reexamine the established authorities on which plaintiffs' case firmly rests, we regard them ultimately as but anticipatory of cases wholly unlike the one we must decide today.

Paladin Press in this case has stipulated that it specifically targeted the market of murderers, would-be murderers, and other criminals for sale of its murder manual. Paladin has stipulated both that it had knowledge and that it intended that Hit Man would immediately be used by criminals and would-be criminals in the solicitation, planning, and commission of murder and murder for hire. And Paladin has stipulated that, through publishing and selling Hit Man, it "assisted" Perry in particular in the perpetration of the brutal triple murders for which plaintiffs now seek to hold the publisher liable. Beyond these startling stipulations, it is alleged, and the record would support, that Paladin assisted Perry through the quintessential speech act of providing Perry with detailed factual instructions on how to prepare for, commit, and cover up his murders, instructions which themselves embody not so much as a hint of the theoretical advocacy of principles divorced from action that is the hallmark of protected speech. And it is alleged, and a jury could find, that Paladin's assistance assumed the form of speech with little, if any, purpose beyond the unlawful one of facilitating murder.

Paladin's astonishing stipulations, coupled with the extraordinary comprehensiveness, detail, and clarity of Hit Man's instructions for

64

criminal activity and murder in particular, the boldness of its palpable exhortation to murder, the alarming power and effectiveness of its peculiar form of instruction, the notable absence from its text of the kind of ideas for the protection of which the First Amendment exists, and the book's evident lack of any even arguably legitimate purpose beyond the promotion and teaching of murder, render this case unique in the law. In at least these circumstances, we are confident that the First Amendment does not erect the absolute bar to the imposition of civil liability for which Paladin Press and <u>amici</u> contend. Indeed, to hold that the First Amendment forbids liability in such circumstances as a matter of law would fly in the face of all precedent of which we are aware, not only from the courts of appeals but from the Supreme Court of the United States itself. <u>Hit Man</u> is, we are convinced, the speech that even Justice Douglas, with his unrivaled devotion to the First Amendment, counseled without any equivocation "should be beyond the pale" under a Constitution that reserves to the people the ultimate and necessary authority to adjudge some conduct -- and even some speech -- fundamentally incompatible with the liberties they have secured unto themselves.

The judgment of the district court is hereby reversed, and the case remanded for trial.

<u>It is so ordered</u>

65